**In the Matter of Richard C. SCARLATA, Debtor.**

**GOLDBERG SECURITIES, INC., Appellant,**

v.

**Richard C. SCARLATA, Debtor–Appellee.**

No. 91–2304.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1992.

Decided Nov. 9, 1992.

Inc. (Goldberg). The bankruptcy court barred Scarlata from discharge under 11 U.S.C. § 523(a)(2)(A) but found § 523(a)(6) inapplicable to this case. *In re Scarlata,* 112 B.R. 279 (B.C.N.D.Ill.1990). The district court reversed the bankruptcy court's finding under § 523(a)(2)(A), affirmed under § 523(a)(6), and granted Scarlata a discharge. *In re Scarlata,* 127 B.R. 1004, 1011 (N.D.Ill.1991). On appeal, Goldberg argues that Scarlata is not entitled to a discharge because 1) he tendered a check for which he did not have sufficient funds in his bank account, creating a false pretense that he had greater funds with which to trade; 2) he misrepresented his trading intentions, falsely stating that he would reduce his risk exposure; and 3) he willfully and maliciously injured Goldberg's property by trading contrary to his representations and with Goldberg's money. Although we differ with a portion of the district court's opinion, we affirm its judgment granting Scarlata the discharge.

### Facts

Scarlata was once a professional market maker at the CBOE. For four years, he traded options on an account through Goldberg. According to the various arrangements between Scarlata, Goldberg, and the CBOE, Goldberg received fees on Scarlata's transactions, as well as interest on money loaned to him; in exchange, Scarlata received certain services. The most important of these was that Goldberg guaranteed Scarlata's losses in excess of the equity in his account. As a result, Goldberg was potentially liable for 100% of Scarlata's losses in excess of his equity, even though it was not entitled to receive a share of his profits. Despite its one-sided exposure, Goldberg, like other clearing houses, had no electronic means of controlling Scarlata's trades once he was in the pit; when Scarlata (or any other market maker) traded, Goldberg relied on him to adhere to a "haircut requirement" which obliges him to have funds in his account to cover potential losses from unliquidated outstanding securities positions. The haircut requirement thus limits traders' ability

Donald C. Shine, Michael H. Moirano (argued), Nisen & Elliott, Chicago, Ill., for appellant Goldberg Securities, Inc.

Andrew B. David (argued), William G. Gigler, Sugar, Friedberg & Felsenthal, Chicago, Ill., for debtor, appellee Richard C. Scarlata.

Before COFFEY and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Richard Scarlata, a market maker who formerly traded options at the Chicago Board of Exchange (CBOE), seeks a discharge in bankruptcy from a $4 million debt owed to the firm who cleared his accounts at the CBOE, Goldberg Securities,

to take positions in excess of their personal ability to cover trading losses. Goldberg considered a trader's position to be risky if the trader had a haircut requirement over $100,000, had an equity deficit in his account, or had a haircut-to-equity ratio greater than 2–1. R. 2–2 at 19.[1] Based on these three factors, Goldberg would monitor its traders at the end of every day; if the trader's position was considered risky, the firm might require him to reduce his positions, deposit more capital in his account, or, in an extreme case, liquidate his holdings.

Cut to the morning of October 19, 1987—"Black Monday"—when the Dow Jones Industrial Average lost approximately 22% of its value. The Dow had dropped more than 100 points the previous Friday, leaving Scarlata, as well as numerous other traders, in precarious positions. Scarlata had only $22,000 of equity in his account, but held 84 naked short puts amounting to a $150,000 risk exposure.[2] Despite this 7–1 ratio, Scarlata wanted to trade that day. He wrote Goldberg a check for $30,000, even though he did not have sufficient funds in his bank account to cover the $30,000. Scarlata also told Goldberg's risk managers, the employees who monitor the traders, that he would reduce his positions. Yet Scarlata exponentially increased his exposure during the first rotation on the market floor. Over the course of the rest of the day, Scarlata never managed to reduce his positions. Although he began trading with an exposure of just over $100,000, he ultimately lost approximately $5 million.[3] Because it had guaranteed Scarlata's trades, Goldberg paid the bulk of these losses.

Now Scarlata is in bankruptcy, seeking a discharge from his debt to Goldberg. As discussed above, the district court granted the discharge, reversing the bankruptcy court's findings that Scarlata had misrepresented his trading intentions and created a false pretense. The district court erred by applying the clear and convincing standard of proof, and the bankruptcy court's finding that Scarlata misrepresented his trading intentions may not have been clearly erroneous. Nevertheless, Goldberg did not prove that it relied on Scarlata's representation that he intended to reduce his positions. Further, we agree with the district court that Scarlata did not make a false pretense when he tendered the check. Finally, Goldberg has not explained how or whether the bankruptcy court and district court erred in concluding that Scarlata's actions were not malicious. Thus, we affirm.

### Analysis

█ In bankruptcy, "exceptions to discharge are to be constructed strictly against a creditor and liberally in favor of the debtor." *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir.1985). The burden is on the objecting creditor to prove exceptions to discharge. *Minnick v. Lafayette Loan & Trust Co.*, 392 F.2d 973, 976 (7th Cir.), *cert. denied*, 393 U.S. 875, 89 S.Ct. 170, 21 L.Ed.2d 146 (1968). Although Goldberg may have proved that Scarlata misrepresented his trading intentions, we do not believe it carried its burden to prove reliance or to prove the applicability of the "willful and malicious injury" exception.

### Count I—§ 523(a)(2)(A)

█ The bankruptcy court held that Scarlata had made a "false pretense" by tendering a check for which he did not have

---

**1.** The record in this case is confusingly indexed. As a result, we have cited the trial transcript by date instead of docket number.

**2.** Scarlata traded in puts, which are option contracts under which the holder of the option has the right to sell a specified number of shares at a particular price. A trader is "short" if he has sold more options than he has bought. If a trader is short, he or she hopes that the market will move up. Finally, a trader's position is "naked" or "uncovered" if the trader does not hold countervailing positions which minimize his or her risk. By concluding that Friday with 84 naked short puts, therefore, Scarlata had made a large bet that the market would open higher on Monday morning.

**3.** After making certain adjustments, the bankruptcy court calculated Scarlata's debt to Goldberg at $4,019,091.87. *In re Scarlata*, 112 B.R. 279, 287 (B.C.N.D.Ill.1990).

any assets, and that he had misrepresented his trading strategy by promising to reduce his positions but immediately escalating them instead. 112 B.R. at 287. The district court reversed both holdings. We agree with the district court as far as the check is concerned. In *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), the Supreme Court held that knowingly passing a bad check is not a "false statement" within the meaning of 18 U.S.C. § 1014. The Court reasoned that "a check is not a factual assertion at all"; a check "serve[s] only to direct the drawee banks to pay the face amounts to the bearer...." *Id.* 458 U.S. at 284, 102 S.Ct. at 3091. Although *Williams* involved a criminal statute and construed the word "statement", its reasoning governs whether Scarlata's check was a false pretense in this civil bankruptcy case. *See, e.g., In re Hunt*, 30 B.R. 425, 438 (M.D.Tenn.1983) ("creditor cannot rely solely on the existence of an NSF check ... to establish a misrepresentation for § 523(a)(2) purposes"); *In re Horwitz*, 100 B.R. 395, 398 (B.C.N.D.Ill.1989) (acknowledging split on this issue, but persuasively noting that contrary cases have ignored *Williams*). Moreover, even if passing a bad check were a false pretense within § 523(a)(2)(A), Scarlata's check was not bad. The day after writing the check, Scarlata withdrew sufficient cash from his credit cards and deposited it in his checking account. The check did not bounce.

As for Scarlata's statement that he would reduce his positions, Goldberg needed to prove 1) that Scarlata made a statement either knowing it to be false or with reckless disregard for the truth; 2) that in making this misrepresentation Scarlata possessed "scienter, *i.e.*, an intent to deceive" Goldberg; and 3) that Goldberg actually and reasonably relied upon the misrepresentation. *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985). Because Scarlata

was making a statement of future intention, it is possible that Scarlata's statement was true when made; intervening events may have caused his future actions to deviate from his prior intentions. W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 109, at 764–65 (5th ed. 1984). Scarlata claims that he truly intended to reduce his positions, but that exceptional circumstances prevented him from doing so. The bankruptcy court found that Goldberg proved Scarlata's fraud by clear and convincing evidence. 112 B.R. at 286–87. The district court held that this conclusion was clearly erroneous because "[t]here is no evidence in the record to support the bankruptcy court's conclusion that Scarlata had formulated a plan over the weekend to substantially increase the size of his short put position." 127 B.R. at 1011. But the district court applied the wrong standard of proof; a few months before the district court's opinion, the Supreme Court held that "the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S. at 279, ——, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).[4] We are thus faced with a curious question: was the bankruptcy court's conclusion that Goldberg proved the exception by clear and convincing evidence clearly erroneous even under a preponderance standard?

We need not answer this question. Even if Scarlata did misrepresent his trading intentions to Goldberg, Goldberg did not prove that it relied on Scarlata's statement.[5] The bankruptcy court held that Goldberg had proved reasonable and actual reliance, but it did not specify any facts in support of this conclusion. 112 B.R. at 284–85. To the extent that the bankruptcy court did explain its reasoning, the court stated that "[h]ad Goldberg known that Scarlata ... intended to in-

---

4. Although *Grogan v. Garner* had not been decided when the bankruptcy court made its decision, Scarlata does not argue that *Grogan v. Garner* should not be applied retroactively to this case. Appellee's Br. at 20. Accordingly, we assume that the decision does apply.

5. Although the district court did not reach the issue of reliance, we may affirm on any basis supported by the record. *In re Memorial Estates, Inc.*, 950 F.2d 1364, 1370 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2969, 119 L.Ed.2d 589 (1992).

crease substantially rather than decrease or neutralize his existing position, it would have [sic] *not have allowed him to trade freely that day."* *Id.* at 285 (emphasis supplied). This holding was expressly contradicted by the testimony of Goldberg's senior risk manager, the only Goldberg witness on the subject of reliance. The risk manager admitted on cross examination that if Scarlata had given him a check for $30,000 on the morning of October 19 and said nothing further, he would not have prevented him from going on the trading floor. R. 2–2 at 86. The plaintiff brought little evidence of reliance to overcome this admission. On direct examination, the risk manager rather formulaically testified that he had "rel[ied] on the truthfulness of Mr. Scarlata's statement." R. 2–2 at 58–59. He further stated that he took Scarlata off his list of problem accounts after the representation. R. 2–2 at 44. Goldberg presented no evidence from its other employees to support its claim of reliance.

■ Furthermore, Goldberg did not present sufficient circumstantial evidence of reliance. As everyone involved recognizes, the morning of Black Monday was exceptionally hectic. Indeed, the risk manager considered it "the busiest morning [he had] experienced as a risk manager at Goldberg up to that point." R. 2–2 at 84–85. In these harried circumstances, Scarlata was far from Goldberg's greatest concern. Although he was on the risk manager's list of problem accounts, so were 24 other traders, and most of them were in much more serious condition than Scarlata. Four had haircut deductions over $1,000,000; 5, over $500,000; 16 between $100,000 and $500,-

000. R. 2–2 at 32–33. At least five traders had equity deficits, including deficits of $390,000 and $639,000. "[T]here were a lot of traders that morning that needed definite review." R. 2–2 at 69–72. Considering the risk manager's damaging admission that he would not have prevented Scarlata from trading even if Scarlata had not made the representation, we believe that Goldberg did not satisfy its affirmative burden of proving reliance.[6] As a result, Scarlata is not barred from discharging his debt under § 523(a)(2)(A).

*Count II—§ 523(a)(6)*

■ Goldberg also argues that Scarlata's debt should be barred from discharge under § 523(a)(6), which denies a discharge for "willful and malicious" injury to property of another. The meaning of "malicious" is a subject of considerable conflict among lower courts as well as courts of appeals. Some courts have interpreted malicious to require an "intent to do harm", while others have applied an implied or constructive malice standard derived from *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904). *See generally United Bank of Southgate v. Nelson,* 35 B.R. 766, 770 (N.D.Ill.1983) (discussing split in authorities). This circuit has not taken a definitive stand on the question, and it is unnecessary for us to reach that issue of first impression here. Both the bankruptcy court and the district court held that Scarlata did not act maliciously because his acts would not "automatically or necessarily" cause injury to Goldberg. Scarlata's job involved, at least to a certain extent, trading with Goldberg's money. And if his

---

**6.** The dissent would apparently presume reliance based on the relationship of the parties and *what it considers to be the blatancy of* Scarlata's fraud. The dissent argues that Goldberg reasonably relied on Scarlata because his past history as a trader had led Goldberg to believe that he would trade conservatively. Dissent at 530–32. It may be true that relying on Scarlata's past trading history was reasonable. Goldberg's burden, however, was not to prove that it relied on Scarlata's past history, but to prove that it "actually relied *on the false representation....*" *Kimzey,* 761 F.2d at 423 (emphasis added). Goldberg did not present even minimal evidence that it relied on Scarlata's repre-

sentations. All Goldberg needed to do was have one of its risk managers testify that he would have done *something differently* had Scarlata not made the alleged misrepresentation. But the only risk manager to testify contradicted himself on this point, expressly admitting that he would *not* have done anything differently. Finally, *Carini v. Matera,* 592 F.2d 378 (7th Cir.1979), does not support the dissent's argument. *Matera* does not hold that the relationship between a person who defrauds and his victim can provide otherwise lacking evidence of reliance; it holds merely that once reliance has been established, the parties' past relation-

gambles had paid off, Goldberg would not have been injured. 112 B.R. at 290; 127 B.R. at 1013. Thus, the lower courts apparently believed that Scarlata never acted maliciously to take an enormous risk at Goldberg's expense, but became gradually embroiled in the crashing market.

■ Rather than explain whether and why the district court erred in concluding that Scarlata's acts would not necessarily cause harm, Goldberg instead argues that the district court erroneously applied the specific malice standard rather than the implied malice standard. Goldberg urges us to adopt the implied malice standard which was adopted in *Southgate* and derived from *Tinker*. Appellant's Br. at 40. But even if we were to adopt the *Southgate* standard, the conclusion of the bankruptcy and district courts would not be undermined. *Southgate* defined a willful and malicious injury as "a deliberate or intentional act in which the debtor *knows his act would harm the creditor[']s interest* and proceeds in the fact [sic] of that knowledge" (emphasis added). 35 B.R. at 776. In addition, the *Southgate* court explicitly adopted its implied malice standard from *Tinker*, which required that a willful and malicious act "necessarily cause[ ] injury." 193 U.S. at 486–89, 24 S.Ct. at 509. Therefore, even the *Southgate* standard requires proof that the debtor took the sort of actions that would "automatically or necessarily" harm the creditor. *See also In re Guy*, 101 B.R. 961, 982 (B.C.N.D.Ind.

1988) ("[M]alice may exist by implication or constructively because the debtor's actions indicate he knew that his actions would result in injury."); *In re Condict*, 71 B.R. 485, 487 (N.D.Ill.1987). As noted above, that is the standard the bankruptcy and district courts applied, and Goldberg has failed to give us a reason to overturn this holding.

■ The dissent contends that the law in other circuits supports barring Scarlata's debts from discharge. We believe that the dissent reaches out to decide a difficult issue of first impression. Indeed, the dissent does an admirable job of attempting to discover what Goldberg perhaps *ought* to have argued.[7] But Goldberg has not explained why the district court and the bankruptcy court erred in using the "necessarily causes harm" standard; Goldberg has affirmatively requested that we adopt a malice standard which uses the same language; and Goldberg has not developed any argument which would support analogizing this case to the typical cases that arise under § 523(a)(6).[8] We will not reverse the district court's decision when the appellants "have failed to identify, let alone explain, any error committed by the district court." *Sears, Roebuck & Co. v. The Murray Ohio Mfg. Co.*, 949 F.2d 226, 228 (7th Cir.1991); *see also Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225, 230 (1992) ("if an appellant fails to make a minimally complete and comprehensible argument for each of his claims, he loses

ship can indicate whether that reliance was reasonable.

7. The dissent cites two sentences from Goldberg's initial brief in which Goldberg squarely presented the issue we decline to reach. Dissent at 534. Unfortunately, Goldberg did nothing more than "present" that issue, and it pursued a different argument in its briefs.

8. Section 523(a)(6) cases typically fall into one of two categories: (1) claims by a creditor that the debtor sold collateral subject to a security agreement, and (2) attempts by creditors to have previously-entered judgments against the debtor found non-dischargeable. *Kimzey,* 761 F.2d at 425. This case obviously does not fall into category (2), as Goldberg has not received a judgment against Scarlata in any other action. The dissent apparently believes that this case is similar to category (1): that in violating the

haircut-to-equity ratio, Scarlata violated an agreement and deprived Goldberg of a "secured" interest. But Goldberg has not argued that the analogy of security agreement cases should apply, nor has it proven any of the subsidiary facts that would be necessary for us to come to that conclusion. For example, Goldberg has not proven that the haircut-to-equity ratio has the binding contractual effect of a security agreement. In addition, Goldberg has not proven that Scarlata had a duty to stay within the haircut-to-equity ratio at all points during the trading day; Scarlata's trading activities were not monitored during the day. As a result, this case is very different from a breach of a security agreement, where the debtor breaches the agreement the moment he misuses the collateral. Therefore, a debtor who misuses collateral has breached the agreement even if the breach is ultimately profitable.

regardless of the merits of those claims as they might have appeared on a fuller presentation"). We should not decide a difficult question of first impression under these circumstances.

### Conclusion

Because Goldberg failed to prove that it relied on Scarlata's misrepresentation, it may not bar the debt from discharge under § 523(a)(2)(A). And since Scarlata did not take the sort of actions that would necessarily harm Goldberg, and Goldberg has not clearly argued any alternative definition of malice, Scarlata is not barred under § 523(a)(6). Accordingly, the judgment granting the discharge is AFFIRMED.[9]

COFFEY, Circuit Judge, dissenting.

I fail to understand how the majority can review the facts that clearly establish Scarlata's willful and malicious actions in defrauding Goldberg Securities, Inc. ("Goldberg"), and then, while supposedly giving deference to the bankruptcy judge's findings, hold that Scarlata's debt to Goldberg was neither barred from discharge under the fraud exception of § 523(a)(2)(A) nor under the willful-and-malicious-injury exception of § 523(a)(6). As the majority noted, when the stock market closed on Friday, October 16, 1987, Scarlata held a risk exposure of $150,000 with only $22,000 of equity in his account with Goldberg. According to Goldberg's standard operating procedures, a trader in Scarlata's position would be allowed on the floor to trade on Monday morning only if he a) agreed to lower his risk exposure to the requisite 2–1 ratio (in Scarlata's case, to $44,000 exposure) or b) deposited sufficient

funds into his equity account to bring the account to one-half of the risk exposure ($73,000 for Scarlata). See Maj.Op. at 523–24. This policy was to "limit[] traders' ability to take positions in excess of their *personal ability* to cover trading losses." *Id.* (emphasis added).

In order to get around his excessive haircut requirement ($150,000 haircut requirement with only $22,000 equity) and persuade Goldberg's risk manager to allow him to enter the trading floor on "Black Monday," October 19, 1987, Scarlata presented the manager with a $30,000 check (while his checking account had a balance of only $3,200) stating that he would reduce his exposure. The combination of a $30,000 deposit and promising to lower his risk position would have marginally fulfilled Scarlata's haircut requirement had he kept his word to Goldberg's risk manager regarding his alleged lowering of his exposure. He did not. Instead, he "exponentially increased his exposure during the first rotation on the market floor." *Id.* at 524. Scarlata thus carried out his scheme[1] to deceive Goldberg's risk manager into allowing him to trade on "Black Monday" in an attempt to make his fortune in what he thought would be a fluctuating (rather than falling) market and caused Goldberg Securities to incur a loss of over $4 million in one day's trading. The enormity of Scarlata's gamble is evinced by the fact that he was only one of twenty-five traders with a serious deficit on the morning of October 19, 1987.[2] The twenty-four other Goldberg traders who acted responsibly on that date suffered a combined loss of but $3 million while Scarlata individually incurred a $4 million liability.

9. This opinion has been circulated among all judges of this court in regular active service. A majority did not favor a rehearing in banc on the question of whether this decision has defined the term "malicious" as it is used in § 523(a)(6) of the Bankruptcy Code in such a way as to stand in conflict with other Circuits. Judges Coffey, Ripple and Manion voted in favor of rehearing in banc.

1. The bankruptcy judge found that Scarlata formulated a plan over the weekend to take advantage of an active market. Since he was broke,

he could not carry out his strategy without trading on credit that Goldberg would have refused to extend to him. Thus, his ability to succeed in his plan was dependent upon his deceiving Goldberg into allowing him on the trading floor. As I demonstrate below, the bankruptcy court's finding that Scarlata conceived his scheme over the weekend was not clearly erroneous.

2. Scarlata commenced trading that day with a $150,000 risk exposure and ended the day with a $4 million loss.

Under the circumstances of this case, we should not allow Scarlata's $4 million debacle and debt to Goldberg to be discharged in bankruptcy. The majority quotes from the case of *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir.1985), for the proposition that "exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor." Maj.Op. at 524. But the majority ignores the basic policy of granting discharge of debts under the bankruptcy code is to give *only* the *"honest but unfortunate debtor"* a fresh start. *Brown v. Felsen*, 442 U.S. 127, 128, 99 S.Ct. 2205, 2208, 60 L.Ed.2d 767 (1979) (emphasis added). Scarlata certainly does not fit the description of an *honest, unfortunate debtor* under any stretch of the imagination, for his debt of over $4 million was incurred as a result of his unconscionable gambling with Goldberg's money in contravention of Goldberg's rules and past practices (requiring stockbrokers to trade within their credit limits) and without its knowledge or consent. When Scarlata entered the trading floor on "Black Monday," he was at the end of his financial rope, with little or nothing to lose and everything to personally gain by gambling with Goldberg's monies at no risk to himself. Scarlata well knew that Goldberg would be liable for 100% of his (Scarlata's) losses in excess of his personal ability to pay but that the firm would not be entitled to share in the profits of his speculation if he was successful. The record supports the bankruptcy court's finding that Scarlata deliberately chose to risk Goldberg's money on an all-or-nothing gamble, at no risk to himself (if he can be discharged in bankruptcy). Scarlata lost more money in one day on his wild foray than the vast majority, less than 5% of the American people earn in a lifetime, but had his gamble paid off, he would have been in the peach orchard as a multi-millionaire. Now he has the ultimate gall to ask the courts to excuse him from paying for the consequences of his egregious and unprincipled conduct. The bankruptcy judge found that Scarlata deliberately misrepresented his intentions to Goldberg Securities, and the firm reasonably relied upon his representations. Thus, the bankruptcy court properly held the debt to be non-dischargeable. On the basis of a cold record the district court reweighed the evidence in contravention of a myriad of case law, *see e.g., Calder v. Camp Grove State Bank*, 892 F.2d 629, 631 (7th Cir.1990) (bankruptcy court's factual findings reviewed under clearly erroneous standard); *Tyson v. Jones & Laughlin Steel Corp.*, 958 F.2d 756, 759 (7th Cir.1992) (reviewing court is not to upset lower court's choice between "two permissible views of the evidence"); *Bennett v. Local Union No. 66*, 958 F.2d 1429, 1433 (7th Cir.1992) ("[F]act-finder's choice [among permissible inferences] is not clearly erroneous, even [if reviewing court] ... would have weighed evidence differently."), and reversed the judgment. In my opinion the district court and now the majority are setting a bad precedent in granting a discharge to an egregious debt incurred in this scandalous manner. This is a dangerous legal precedent to promulgate, for it will not only allow, but serve to encourage, a stockbroker or any other fly-by-night financial manipulator who finds himself in over his head to gamble with another person's money, in this instance a brokerage firm's, rather than to act reasonably and cut his losses.

### A. § 523(a)(2)(A)

As a matter of policy, the Code and supporting case law should serve to prevent discharge in at best highly questionable circumstances of this nature, and from my reading of it, I am confident it does. Section 523(a)(2)(A) prevents discharge of a debt incurred by gaining money or an extension of credit through "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." The bankruptcy judge found that Scarlata intentionally made a false representation that Goldberg relied upon and that discharge was therefore inappropriate. "It is well settled that findings of fact made in a bankruptcy proceeding will not be set aside by a reviewing court unless 'clearly erroneous.'" *In re Martin*, 698 F.2d 883, 885 (7th Cir.1983) (emphasis added). I fail to

understand how the district court and now my brothers at the appellate level can reject the bankruptcy court's findings in contravention of existing case law, for I believe that the record amply supports the bankruptcy court's finding that Scarlata's conduct was intended to, and did, induce Goldberg to allow Scarlata to go far beyond the parameters of fair and reasonable judgment in risking millions of dollars of Goldberg's funds in an attempt to regain his own personal financial solvency.

The bankruptcy court found that Scarlata contrived a scheme over the weekend before "Black Monday" to "take advantage of what he perceived to be a substantial opportunity in the active market. He saw an opportunity to make large personal profits, perhaps millions of dollars, in that market." *In re Scarlata*, 112 B.R. 279, 284 (Bankr.N.D.Ill.1990). This finding is supported in Scarlata's deposition testimony concerning his conversation with another options trader during a golf game the day before "Black Monday" in which they discussed the "buying opportunity" in the market. It is also supported by Scarlata's actions on Monday morning of immediately increasing his risk more than ten times his opening position in the first hour and one half of trading even though, as the bankruptcy judge found: "Prior to the opening of trading on October 19, 1987 Scarlata knew, from reports that were coming in from other markets around the world, that the [market] would open significantly lower." *Id.* at 285. Given this support for the bankruptcy judge's finding that Scarlata formulated his plan over the weekend, the bankruptcy court's findings were not clearly erroneous. The district court ignored these facts when it

"conclude[d] that the bankruptcy court's finding that Scarlata['s] statement was knowingly false when made and thus that he misrepresented his intended trading strategy is not supported by the record and thus is clearly erroneous. There is no evidence in the record to support the court's conclusion that Scarlata had formulated a plan over the preceding weekend to increase substantially his short OEX position. Rather, the record

contains Scarlata's uncontradicted testimony that he intended to reduce or neutralize his positions when he made the statement to Goldberg's risk manager."

Mem.Op. at 12–13. Although Scarlata somehow claims that he believed the market would open higher at the time he gave Goldberg's risk manager the $30,000 check at 6:10 a.m. and fully intended to reduce his position, there was counter-testimony that by 6:00 a.m. it was evident that the market would be opening lower and that Scarlata did not deliver the check until after 7:00 a.m. The bankruptcy judge's finding that Scarlata knew the market would be opening lower reveals that he disbelieved Scarlata's testimony. Since the record supports a finding that Scarlata viewed a falling market as a buying opportunity as well as a finding that Scarlata knew that the market would open lower early on "Black Monday," there is ample support for the bankruptcy court's finding that Scarlata deliberately misrepresented his intentions to Goldberg Securities and Goldberg reasonably relied upon his representations. Scarlata's entire course of conduct on "Black Monday" demonstrates that he viewed the day as a golden opportunity and intended to do whatever was necessary to recover his losses and make a fortune that day gambling with Goldberg's credit. The bankruptcy court had the opportunity to hear the testimony of the witnesses and observe their conduct, the tone of their voices in making their responses, their eyes, and their facial expressions while evaluating their credibility. The judge obviously found Scarlata's testimony regarding his intentions to be incredible in light of the other evidence. A trial judge or jury makes findings of fact, and it is not our place as an appellate court to "weigh the evidence or assess the credibility of the witnesses." *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986). We should defer to the bankruptcy court's resolution of the conflicting evidence and affirm its holding that Scarlata's debt is nondischargeable under § 523(a)(2)(A).

The majority states that we need not decide whether Scarlata formed a plan be-

tween October 16, 1987 and the morning of October 19, 1987, to take advantage of what he perceived to be a buying opportunity and "to substantially increase the size of his short put position." Maj.Op. at 525. Even if I were to agree with the majority (which I do not) that the basis for Scarlata's trading strategy on Black Monday is irrelevant, I strongly disagree with the majority's conclusion that: "[e]ven if Scarlata did misrepresent his trading intentions to Goldberg, Goldberg did not prove that it relied on Scarlata's statement." Maj. Op. at 525. The majority, after reweighing the evidence, went out of its way to make a finding that neither the district court nor the bankruptcy court made in holding that Goldberg failed to demonstrate reasonable reliance. I am perplexed at the majority's microscopic-type limited view of Scarlata's representation and Goldberg's reliance upon it to hold that there was no reliance. The statute, § 523(a)(2)(A), prohibits discharge when credit is gained through "false pretenses, *a false representation, or actual fraud....*" (Emphasis added).

> "It is not necessary for a person to make oral misrepresentation[s] of fact in order to be guilty of fraudulent conduct—such representations may be made by the acts or conduct of the party.... There is no distinction between misrepresentations effected by words and misrepresentations effected by other acts."

*Bay State Milling Co. v. Martin,* 916 F.2d 1221, 1227 (7th Cir.1990) (citations omitted). It is likewise unnecessary for the record to include direct evidence that Scarlata intended to deceive Goldberg, for "an intent to deceive may logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan [or extend credit]." *In re Kimzey,* 761 F.2d 421, 424 (7th Cir.1985). If Scarlata was not guilty of misrepresentation in submitting his $30,000 check and stating that he would reduce his risk posi-

tion as evidence of his ability to financially cover his trading losses, under what circumstances would any market maker ever be guilty of misrepresentation?

> "Fraud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture."

*In re Witt,* 145 Ill.2d 380, 164 Ill.Dec. 610, 583 N.E.2d 526, 531 (1991) (citation omitted). Goldberg did not merely rely upon Scarlata's writing of the $30,000 check or his statement that he would lower his risk position (the check and the statement were necessary to satisfy Goldberg's usual requirements); it relied on Scarlata's entire course of conduct that ended in the $4 million loss to Goldberg. Scarlata had traded with Goldberg for a period of four years dating back long before "Black Monday" and, because Scarlata was well aware of Goldberg's practice and limitations on trading, he had never before ever engaged in wild and uncontrolled speculation. He had been careful to establish a reliable and conservative reputation with Goldberg from 1984 to 1987 (Tr. 2-2-90 at 107), and, as the majority notes, "Goldberg relied on him to adhere to a 'haircut requirement' which obliges him to have funds in *his* account to cover potential losses from unliquidated outstanding securities positions."[3] Maj.Op. at 523 (emphasis added). Scarlata's obligation to Goldberg on October 19, 1987, was no different than it had been for the past four years, i.e., that *Scarlata* was responsible personally to cover all of his losses. Scarlata's deposit of the $30,000 check in his account constituted a representation[4] that he intended to fulfill this obligation to Goldberg and this gave Goldberg every reason to believe that he

---

**3.** In other words, a stockbroker who is trading within his "haircut requirement" is complying within the brokerage firm's (and the SEC's) credit limitations.

**4.** The majority makes much of the fact that writing a bad check is not a "false statement."

Maj.Op. at 525. In the context of Scarlata's trading relationship with Goldberg, it was the act of tendering the check that constituted a representation that he would trade within Goldberg's rules.

(Scarlata) would continue his past course of conduct and comply with his duty of trading within a 2–1 haircut-to-equity ratio and within his personal ability to cover trading losses.[5] *Cf. In re Matera*, 592 F.2d 378, 381 (7th Cir.1979) (the past relationship of the parties may have a significant impact on reasonable reliance).

The majority errs when it says the bankruptcy court's "holding [that Goldberg relied on Scarlata's misrepresentation] was expressly contradicted by the testimony of Goldberg's senior risk manager...." Maj. Op. at 525–26. The fact that the risk manager might have allowed Scarlata on the floor without a statement that he would reduce his risk position in no way contradicts or detracts from the statement of the fact finder, the bankruptcy judge, that "[h]ad Goldberg known *that Scarlata ... intended to increase substantially rather than decrease or neutralize his existing position*, it would have not have [sic] allowed him to trade freely that day."[6] The majority casts aside and disregards the risk manager's testimony that he would not have allowed Scarlata to trade if Scarlata had informed him that he intended to increase his risk position when the market opened. Goldberg was relying on Scarlata's representation through his $30,000 check that he would trade in accord with his past course of conduct within the "haircut requirement" rather than the reckless, abnormal, and speculative method he admittedly adopted on "Black Monday."

The majority argues that the testimony of Goldberg's senior risk manager failed to establish sufficient evidence that it relied on Scarlata's representation, even though Goldberg's risk manager in response to a question, *"[d]id you rely on the truthfulness of Mr. Scarlata's statement to you that he would be cutting down his position on the morning of October 19th, 1987,"* emphatically stated under oath, *"Yes, I did."* How much more of a direct, clear and unequivocal answer could there be to the question posed, I do not know. The panel attempts in a three-page discussion to play down and diminish the risk manager's response that he relied on Scarlata's statement that his (Scarlata's) risk position would be reduced. On the other hand, I am at a loss to understand what other words in the English language other than, *"Yes, I did [rely],"* more plainly express an affirmative answer that a risk manager is relying on a trader's representation regarding his risk position. Further, it is interesting to note that Scarlata's attorney on cross-examination did not question the risk manager's statement of reliance any further because the answer was so clear and self-evident.[7] There is nothing in the record that contradicts the risk manager's reliance and the absence of cross-examination on the risk manager's reliance furthers the argument that Goldberg relied on Scarlata's statement.[8]

---

**5.** The majority charges that I am "presum[ing] reliance based on the relationship of the parties and what [I] consider[ ] to be the blatancy of Scarlata's fraud." Maj.Op. at 526 n. 6. This is a misconstrual of my argument, for it is clear that Scarlata's submission of the check to the risk manager was a representation (even though not a "statement") that he would fulfill his duty to Goldberg. Based on Scarlata's past trading relationship with Goldberg, it was reasonable for Goldberg to rely on that representation. I am puzzled in regard to the majority's remarks about *Matera. See id.* I refer to *Matera* only for the principle that Goldberg's reliance is reasonable.

**6.** In addition, I note that the risk manager's decision to trust Scarlata and let him trade without a statement that he would cut his risk exposure was premised on the fact that Scarlata wrote Goldberg a $30,000 check to cover any trading losses that he may incur. Yet, when Scarlata tendered the $30,000 check, it was a calculated misrepresentation because the check was worthless until the next day when he borrowed $30,000 against his credit cards to cover the worthless check. (Tr. 1–31–90 at 159–60).

**7.** Because the risk manager's direct examination testimony that he relied on Scarlata's representation was not questioned by Scarlata's attorney, the manager had no need to further re-affirm his reliance on Scarlata's word with further evidence.

**8.** The fact there were many traders with negative equity accounts with Goldberg Securities on October 19, 1987, and the Goldberg risk manager found the day to be "the busiest morning [he had] experienced at Goldberg" does not change the fact Scarlata represented that his position would be cut down and Goldberg's senior risk manager relied on that statement. Dissent at 530, 532 (citing R. 2–2 at 84–85).

The majority, in its attempt to gloss over the risk manager's clear statement of reliance, goes on to write about the lack of circumstantial evidence to support its claim that Goldberg did not rely on Scarlata's representation that he would reduce his risk position. Reliance on an individual's representation can be established through both direct and circumstantial evidence. *In re Kreps*, 700 F.2d 372, 375–76 (7th Cir. 1983); *see Kimzey*, 761 F.2d at 424 (evidence of an intent to deceive may be logically inferred from a false representation). "[D]irect proof of reliance is difficult ..." and rarely available. *In re Kreps*, 700 F.2d at 375–76. In the case before us we have direct and uncontroverted evidence of Goldberg's reliance, in that, the Goldberg risk manager clearly responded, "Yes, I did," when asked whether he relied on Scarlata's representation regarding his risk position. There is no need for circumstantial evidence of Goldberg's reliance in Scarlata's case, despite the majority's attempt to discredit the risk manager's response as insufficient circumstantial evidence, because we have the risk manager's plain and straightforward answer that he relied on Scarlata's statement. Any further evidence of Goldberg's reliance under § 523(a)(2)(A) is unnecessary in light of Scarlata's statement to Goldberg's senior risk manager that he would reduce his risk position. *See In re Kreps*, 700 F.2d at 375–76; *Kimzey*, 761 F.2d at 423–24; *In re Brawner*, 124 B.R. 762 (Bankr.N.D.Ill. 1991); *Matter of Martin*, 130 B.R. 930, 944 (Bankr.N.D.Ill.1991); *In re Guy*, 101 B.R. 961, 977 (Bankr.N.D.Ind.1988).

Moreover, due to Goldberg's four-year relationship with Scarlata wherein he demonstrated his trustworthiness through consistently meeting his "haircut requirement," Goldberg had no reason to be concerned about allowing Scarlata on the trading floor on "Black Monday" as soon as he submitted his check for $30,000 to remedy the equity deficit in his account and above all after he promised to lower his risk position. In view of Scarlata's history of careful and responsible conduct with Goldberg, the deposit of $30,000 in his account (regardless of whether the check was good) constituted a fraudulent representation that Scarlata intended to continue trading within his credit limits and within his personal ability to pay all losses. Thus, even if Goldberg would have allowed Scarlata to trade without his false statement that he would reduce his risk position, Goldberg Security established by more than a preponderance of the evidence that it relied upon Scarlata's false representation that he would trade in his established manner.

### B.  § 523(a)(6)

While I am convinced that the fraud exception to discharge should beyond doubt prevent the discharge of Scarlata's $4 million debt to Goldberg, § 523(a)(6) provides an additional barrier to the discharge. Section 523(a)(6) prevents discharge from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." It is well settled that " 'willful' means deliberate or intentional." S.Rep. No. 95–989, 95th Cong.2d Sess. (1978), *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 5865; H.Rep. No. 95–595, 95th Cong. 1st Sess. (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6320. There is no question that Scarlata's conduct was "willful" in that he intended the acts that resulted in the harm to Goldberg. But the issue of how to determine whether the injury to Goldberg was malicious is a matter of first impression in this court.[9]

The majority notes that "[b]oth the bankruptcy court and the district court held that Scarlata did not act maliciously because his acts would not 'automatically or necessarily' cause injury to Goldberg." Maj.Op. at 526. Initially, we need point out that the panel evades the § 523(a)(6) issue by ignoring the five-page argument Goldberg provided on pages 39–43 of its brief devoted exclusively to the "willful and malicious"

---

**9.** In the two § 523(a)(6) appeals that have previously been brought to this court, we did not find it necessary to interpret the terms "willful and malicious." *See In re Hallahan*, 936 F.2d 1496 (7th Cir.1991); *In re Kimzey*, 761 F.2d 421 (7th Cir.1985).

trading activity of Scarlata on Black Monday, October 19, 1987. Instead of addressing the issue Goldberg presents on appeal, the majority unaccountably states:

"Rather than explain whether and why the district court erred in concluding that Scarlata's acts would not necessarily cause harm, Goldberg instead argues that the district court erroneously applied the specific malice standard rather than the implied malice standard. Goldberg urges us to adopt the implied malice standard which was adopted in [*United Bank of*] *Southgate* [*v. Nelson,* 35 B.R. 766 (N.D.Ill.1983),] and derived from *Tinker* [*v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904) ]. Appellant's Br. at 40."

*Id.* The majority then accuses me of

"reach[ing] out to decide a difficult issue of first impression. Indeed, the dissent does an admirable job of attempting to discover what Goldberg perhaps *ought* to have argued. [ ] But Goldberg has not explained why the district court and the bankruptcy court erred in using the 'necessarily causes harm' standard; Goldberg has affirmatively requested that we adopt a malice standard which uses the same language...."

Maj.Op. at 527 (footnote omitted). I suspect Goldberg will be more than surprised to learn from the majority opinion that it is arguing that "the district court erroneously applied the specific malice standard" and that it requested the court to adopt the necessarily-causes-harm standard. On page 40 of his brief, Goldberg states:

"The issue presented by this appeal is whether, in order to establish malice under § 523(a)(6), the party must show that the debtor's malicious act necessarily and predictably caused the creditor [the] harm complained of. *It is Goldberg's position that it is sufficient to show that [the] debtor acted intentionally and in reckless disregard of whether an injury would be inflicted.*"

(Emphasis added). Likewise, in the "Issues Presented" section of its brief, Goldberg frames the issue as follows:

"whether, in order to prove that a debtor acted maliciously within the meaning of § 523(a)(6), a creditor must prove that the debtor's conduct 'necessarily and automatically' results in harm, or whether it is sufficient that it is reasonably foreseeable that the conduct would cause harm. This latter issue presents a question of first impression in this Court."

After initially stating that "the dissent does an admirable job of attempting to discover what Goldberg perhaps *ought* to have argued," the majority eventually concedes Goldberg squarely presented the § 523(a)(6) argument. Maj.Op. at 527. However, the panel contends that Goldberg did "nothing more than 'present' that issue, and it pursued a different argument in its briefs." Maj.Op. at 527 n. 7. Contrary to the panel's interpretation of Goldberg's § 523(a)(6) argument as consisting of "the two sentences from [its] initial brief," Maj. Op. at 527 n. 7, Goldberg initially introduced its § 523(a)(6) argument with these two sentences referred to above and then went into and proceeded to develop a five-page argument using relevant case law to support its conclusion that Scarlata acted maliciously. This relevant case law adequately supports Goldberg's argument that malicious injury is found in § 523(a)(6) if the *"debtor act[s] intentionally and in reckless disregard of whether an injury would be inflicted* " or if *"it is reasonably foreseeable that the conduct would cause harm."* Plnt.Br. at 40–43 (citing *United Bank of Southgate v. Nelson,* 35 B.R. 766 (N.D.Ill.1983); *Bennett v. W.G. Grant Co.,* 481 F.2d 664 (4th Cir.1973); *In re Posta,* 866 F.2d 364, 367 (10th Cir.1989); *St. Paul Fire and Marine Insurance Co. v. Vaughn,* 779 F.2d 1003 (4th Cir.1985); *Chrysler Credit Corp. v. Perry Chrysler Plymouth,* 783 F.2d 480, 486 (5th Cir.1986); *In re Condict,* 71 B.R. 485, 487 (N.D.Ill. 1987)).[10] The panel's contention that

---

**10.** Specifically, Goldberg argued for the "knowing disregard of the rights" standard in *Vaughn* by explaining that the Fourth Circuit found that

malice could be shown by action undertaken "deliberately and intentionally in knowing disregard of the rights of another." *Vaughn,* 779

Goldberg failed to support the malicious injury issue that it squarely presented before the court is without merit. Thus, I am responding as I must to the arguments Goldberg actually made, thus analyzing the issue squarely presented to us rather than reaching out "to decide a difficult issue of first impression" as the majority accuses. To put it mildly I am surprised that the majority refuses to address the issue presented.[11]

The majority asserts that "*Southgate* defined a willful and malicious injury as 'a deliberate or intentional act in which the debtor *knows his act would harm the creditor[']s interest* and proceeds in the fact [sic] of that knowledge' (emphasis added)." Maj.Op. at 527. The majority overlooks the fact that the *Southgate* court specifically limited the cited definition to "the context of a debtor who sells encumbered property prior to bankruptcy...." *Southgate*, 35 B.R. at 776. As Goldberg notes, the *Southgate* court cited with approval a pre-Bankruptcy Code definition of malice from the Fourth Circuit:

> "if the act of conversion is done deliberately and intentionally in *knowing disregard of the rights of another, it falls within the statutory exclusion even though there may be an absence of special malice.*"

*Id.* at 775 (quoting *Bennett v. W.G. Grant Co.*, 481 F.2d 664, 665 (4th Cir.1973) (emphasis in *Southgate* ). The court went on to observe that "[t]he knowing disregard standard of *Bennett* satisfies the maliciousness requirement." *Id.* at n. 2. Hence, it is doubtful that the *Southgate* court intended to limit the exception to discharge in all cases to "a deliberate or intentional act in which the debtor knows his act would harm the creditor[']s interest," so the bankruptcy court and the dis-

trict court apparently misconstrued the holding of *Southgate*.[12]

But the real issue is not whether the bankruptcy court and the district court (and the majority) have misconstrued *Southgate*, but whether the courts erred in holding that only acts that "automatically or necessarily" cause injury are malicious within the language of § 523(a)(6). The majority considers that Goldberg's arguments regarding the malicious injury "failed to identify, let alone explain, any error committed by the district court." Maj.Op. at 527 (quoting *Sears, Roebuck & Co. v. The Murray Ohio Mfg. Co.*, 949 F.2d 226, 228 (7th Cir.1991)). To the contrary, Goldberg clearly states on page 43 of its initial brief, "[t]he judgment of the district court and bankruptcy court denying Goldberg relief under § 523(a)(6) should be reversed." In addition, Goldberg identified the error of the district court as its failure to use the reckless disregard standard in determining whether Goldberg proved malice. Plnt.Br. at 40–42 (citing *Southgate, Bennett*, and *St. Paul Fire & Marine Insurance Co.; see also Chrysler Credit Corp. v. Perry Chrysler Plymouth*, 783 F.2d 480 (5th Cir.1986)). Therefore, in spite of what the majority seems to interpret in my opinion, Goldberg did properly explain and identify the district court's error in denying Goldberg relief and we should address its arguments.

Further, Goldberg has directly requested that we hold that an act is malicious if "the debtor acted intentionally and in reckless disregard of whether an injury would be inflicted" and cited case law to support its position. This court in the past has decided many other litigants' cases who have properly presented an issue on appeal despite their failing to offer the most extensive analysis of appellate case law. Thus, contrary to the majority's opinion, Goldberg

F.2d at 1010 (quoting *Bennett*, 481 F.2d at 665). Likewise, Goldberg argued that the Fifth Circuit in *Chrysler Credit* defined malicious to mean "without just cause or excuse." *Chrysler Credit*, 783 F.2d at 486.

**11.** Perhaps my writing style presents Goldberg's arguments more forcefully than the appellant

does, but lest the panel forgets, the same can be said for the majority's treatment of Scarlata's argument that Goldberg allegedly failed to prove reliance.

**12.** The bankruptcy court's legal conclusions are subject to *de novo* review. *See Calder,* 892 F.2d at 631.

has given us more than sufficient reason to overturn the finding of the district court, who reversed the bankruptcy (trial) court.[13] *See* Maj.Op. at 527–28. In stating, "the dissent contends that the law in other circuits supports barring Scarlata's debts from discharge," the majority acknowledges that relevant case law from seven circuit courts (Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh) exists but skirts around and fails to explain how this case law does not require overturning the district court's holding as Goldberg requests. As will become clear below, no appellate court has so *unduly restricted* the interpretation of "malicious" as to hold that an action must *"automatically or necessarily"* cause injury to fall within the § 523(a)(6) exception to discharge.

In *St. Paul Fire & Marine Insurance Co. v. Vaughn*, 779 F.2d 1003, 1008 (4th Cir.1985), the Fourth Circuit stated that "if the act ... is done deliberately and intentionally in knowing disregard of the rights of another, it falls within the statutory exclusion [from discharge in bankruptcy]." (Quoting *Bennett v. W.T. Grant Co.*, 481 F.2d 664, 665 (4th Cir.1973)). In *Vaughn*, the debtor, a painting contractor, received payment for a contract with the Navy from his surety because the Navy refused to pay him for work that it required him to perform. After negotiating a settlement agreement with the Navy, the debtor agreed with his surety to deposit the Navy's payment into a trust account and pay $250,000 of the amount to the surety. When the debtor received the payment, he deposited it in a different account and used all of the money for his own purposes, including paying creditors other than the insurance company. Pursuant to § 523(a)(6), the Fourth Circuit refused to grant the debtor discharge for the $250,000 debt even though there was no evidence that he knew that he would be unable to pay the debt at a later time because the debtor acted "deliberately and intentionally in knowing disregard of the rights of [the creditor]." *Id.* at 1010. Under the Fourth Circuit's knowing-disregard-of-the-rights-of-another standard, Scarlata would not have been discharged from his indebtedness to Goldberg because his unprecedented speculative trading on October 19, 1987 (after four years of experience with Goldberg) was with full knowledge that his conduct was in complete and knowing disregard of Goldberg's instructions, rules and procedures, which it had every right to establish and enforce.

In a case analogous to ours, *Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*, 783 F.2d 480 (5th Cir.1986), the Fifth Circuit held that a debt incurred as a result of losing a creditor's money while gam-

---

**13.** The majority observes that "Goldberg has not developed any argument which would support analogizing this case to the *typical cases* that arise under § 523(a)(6)," Maj.Op. at 527 (emphasis added), but it has failed to explain why a creditor's harm must "typically" fall into one of two categories described in *Kimzey* in order to be "malicious." *See In re Kimzey*, 761 F.2d 421, 425 (7th Cir.1985) (category (1): claims by a creditor that the debtor sold collateral subject to a security agreement; and, category (2): attempts by creditors to have previously-entered judgments against the debtor found non-dischargeable). As the relevant case law interpreting the term "malicious injury" reveals, there is no requirement that a "harm" must fall within either of the *Kimzey* categories or any other analogous categories to constitute a "malicious injury."

For example, the debtor in *Vaughn* does not fit within either of the *Kimzey* categories because the debtor improperly spent money received in a settlement for his personal use instead of depositing $250,000 into a trust account

that would reimburse his surety. *See Vaughn*, 779 F.2d at 1007–1010. Likewise, the debtor in *Chrysler Credit* who gambled the money he held in trust for Chrysler Credit to increase his car dealership's cash reserves is different from the typical debtor's breach of a security agreement or attempt to evade a creditor's previously-entered judgment per *Kimzey*. *See Chrysler Credit*, 783 F.2d at 486. In both cases, the court prevented the debtor's discharge in bankruptcy under the willful and malicious exception in § 523(a)(6). *Id.; Vaughn*, 779 F.2d at 1010. Further, the medical malpractice cases are different from the "typical" § 523(a)(6) injury. *See Perkins v. Scharffe*, 817 F.2d 392, 394 (6th Cir.1987); *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir.1986); *In re Britton*, 950 F.2d 602, 605 (9th Cir.1991). Considering the fact that the federal circuits have refused a debtor's discharge in bankruptcy under § 523(a)(6) in cases outside the *Kimzey* "typical" categories, I believe it is irrelevant that Scarlata's case is not analogous to a breach of security agreement or to a previously-entered judgment category.

bling in Las Vegas was non-dischargeable under § 523(a)(6). Because his car dealership was in financial trouble, the debtor took $100,000 that he was obligated to hold in trust for Chrysler Credit to Las Vegas in hopes of bailing his business out of its financial crisis. Had the debtor succeeded in his gamble, he would have been able to pay Chrysler Credit the $100,000 as well as additional monies that he owed it. But as luck would have it, the debtor lost the $100,000. When Chrysler Credit attempted to get a judgment against the creditor for the $100,000 as well as the additional sum he owed, the debtor filed for protection under bankruptcy. The court held that the debt arose from willful and malicious injury to the creditor's property:

> " 'Willful' means intentional and 'malicious' *means without just cause or excuse.* Perry knew that the money he took to Las Vegas was the property of Chrysler Credit. Neither common sense nor statutory construction can stretch his professed purpose of winning enough money to save his dealership into a valid cause or excuse."

*Id.* at 486 (emphasis added) (footnotes omitted). Scarlata's actions differ from Perry's only in that Scarlata gambled with Goldberg's credit rather than its cash. If Scarlata had cut his losses at the opening of trade on October 19, 1987, he still would have been insolvent, but his loss would have been only about $150,000; instead, he chose to depart from his conservative trading history, throw all caution to the wind and speculate with Goldberg's credit in a last-ditch effort to either recoup his losses and become an instant millionaire or incur a debt he knew he was hopelessly incapable of paying. He had no more "just cause or excuse" for his speculation than Perry, who took his creditor's cash to Las Vegas—both were taking risks that an ordinary business person standing in their shoes would consider imprudent.

The Sixth Circuit has stated that malicious "means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Wheeler v. Laudani,* 783 F.2d 610 (6th Cir.1986). In *Wheeler* the court reversed the district court's entry of summary judgment because there were genuine issues of material fact regarding whether the libel at issue was willful. But in *Perkins v. Scharffe,* 817 F.2d 392 (6th Cir.1987), the court relied upon § 523(a)(6) to deny discharge for a debt arising from an injury from medical malpractice. The bankruptcy court found that the injury was caused by the doctor's negligence, but held that the debt was dischargeable because the doctor did not intend the harm. *In re Scharffe,* 40 B.R. 942, 945 (Bankr. E.D.Mich.1984). The bankruptcy judge cited with approval a case holding that the debtor must *know* that his intentional act will harm the creditor. *See id.* at 944. In reversing the bankruptcy court, the Sixth Circuit followed a medical malpractice case from the Tenth Circuit, *In re Franklin,* 726 F.2d 606, 610 (10th Cir.1984), in holding that the debt was not dischargeable. The court cited *Franklin* for the proposition that " 'malicious' requires the intentional doing of an act that necessarily leads to injury." *Scharffe,* 817 F.2d at 394. The medical malpractice in *Scharffe,* as well as in *Franklin,* "necessarily" led to injury only in the sense of proximate cause, not in the sense that the injury was certain to follow the negligent or careless acts of the doctor. Scarlata's debt would not be dischargeable under either *Wheeler* or *Scharffe,* for his conduct was certainly "in conscious disregard of [his] duties or without just cause or excuse," and the acts necessarily led to injury in the sense of proximate cause.

The only circuit that has defined malicious in a manner that even approaches the holding of the bankruptcy court and the district court that the act must "automatically or necessarily" cause injury is the Eighth Circuit, which has held that "malicious" refers to "conduct [that] is certain or almost certain to cause ... harm." *In re Long,* 774 F.2d 875, 881 (8th Cir.1985). The certain-or-almost-certain-to-cause-harm standard continues as the Eighth Circuit's interpretation of malice, *see In re Miera,* 926 F.2d 741, 743–44 (8th Cir.1991), but no other circuit has accepted much less fol-

lowed that line of reasoning. Nonetheless, even under the Eighth Circuit's strict standard of "malicious," Scarlata's debt to Goldberg would be nondischargeable, for at some point during Scarlata's irresponsible trading his conduct became "certain or almost certain to cause harm." Scarlata need be neither a genius nor a rocket scientist to realize that if he continued increasing his risk position in a falling market (as he did), he would certainly cause irreparable harm to Goldberg.

The Ninth and Tenth Circuits have adopted a construction of "malicious" that requires "the debtor's actual knowledge *or the reasonable foreseeability* that his conduct will result in injury to the creditor." *In re Britton,* 950 F.2d 602, 605 (9th Cir. 1991) (quoting *In re Posta,* 866 F.2d 364, 367 (10th Cir.1989)) (emphasis added). In *Britton* the office manager of a cosmetic surgery medical group fraudulently represented himself as a doctor to a patient when he persuaded her to have a surgical procedure done at the medical group's clinic. As a result of malpractice during the surgery, the patient eventually required follow-up corrective surgery. The Ninth Circuit refused discharge of the patient's judgment against the debtor on the basis of both § 523(a)(2)(A) and § 523(a)(6). The court found that the injury to the patient was malicious because "it was foreseeable that injury to [the patient] would result from Britton's intentional misrepresentation." *Id.* (The court noted that "[m]alpractice can be seen as a foreseeable consequence of any medical procedure, including plastic surgery...."). Under the reasonable foreseeability standard of *Britton,* Scarlata's debt to Goldberg would certainly be non-dischargeable because it is reasonably foreseeable that reckless trading in a falling market can result in substantial loss.

In *In re Posta,* 866 F.2d 364, 367 (10th Cir.1989), the case upon which the Ninth Circuit relied, the Tenth Circuit articulated its interpretation of malicious: "the focus of the 'malicious' inquiry is on the debtor's

actual knowledge *or the reasonable foreseeability* that his conduct will result in injury to the creditor...." (Emphasis added). The court noted that while malice can sometimes be demonstrated through direct evidence that the debtor intended to harm the creditor, in the usual case "malicious intent must be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights. Such knowledge can be inferred from the debtor's experience in the business...." *Id.* The court granted the debtors' discharge of the debt because of the district court's factual finding that the debtors did not knowingly violate the creditor's rights. *Id.* at 368. But in this case there can be no doubt that with Scarlata's experience he "had knowledge of [Goldberg's] rights [to require brokers to trade within their credit limits] and that, with that knowledge, proceeded to take action in violation of those rights." Nor can there be any doubt that there was reasonable foreseeability that Scarlata's unprecedented manner of trading on "Black Monday" would cause injury to Goldberg.

Finally, the Eleventh Circuit, in a formulation similar to the Fifth Circuit's, has held that the term "malice" in § 523(a)(6) refers to "wrongful and without just cause or [excuse] even in the absence of personal hatred, spite or ill will." *In re Ikner,* 883 F.2d 986, 991 (11th Cir.1989) (citation omitted). The debt in *Ikner* arose from a judgment the creditor obtained as a result of injuries caused by the debtor's car colliding with the creditor's. Since the creditor failed to prove that the debtor intended to collide with her car and failed to demonstrate either special or implied malice, the Eleventh Circuit affirmed the bankruptcy court's grant of discharge.

As my review of the above cases demonstrates, the majority's approval of the bankruptcy court's and the district court's holding [14] that the § 523(a)(6) exception would not bar Scarlata's discharge is con-

---

**14.** The bankruptcy court and the district courts, which found that an act is malicious only if it "automatically or necessarily" causes injury, held that Scarlata did not act maliciously because his acts would not "automatically or necessarily" cause injury to Goldberg.

trary to the weight of authority. Even the Eighth Circuit's requirement that the conduct be "certain or almost certain to cause ... harm," which no other circuit has followed, does not go so far as to require that the debtor *know* that his action will injure a creditor. The majority acknowledges there is "law in other circuits" (seven circuits) that have applied § 523(a)(6) to bar a debtor's discharge in bankruptcy, but refuses to consider that case law because it considers my interpretation of § 523(a)(6) as "reach[ing] out to decide·a difficult issue of first impression," even though Goldberg properly presented the issue on appeal. Maj.Op. at 527. The majority disregards the overriding federal case law (seven circuits) that have interpreted the malicious injury exception, and fails to *explain* why Scarlata's debts should not be barred from discharge under § 523(a)(6) of the Bankruptcy Code. However, on the basis of the case law interpreting § 523(a)(6) set forth herein, I believe that a "malicious" injury under § 523(a)(6) should be construed as follows: *an injury inflicted in knowing violation or disregard of the rights of another, done without just cause or excuse, when the actor knew or should have foreseen that the injury could occur. Under this interpretation of "malicious," Scarlata's debt would be non-dischargeable because he inflicted the injury on Goldberg in knowing disregard of Goldberg's rights, without just cause or excuse, and should have foreseen that the injury could occur.*

### C. CONCLUSION

Since the appellant has squarely presented the issue of malicious injury in § 523(a)(6), I am not reaching out to decide a difficult issue of first impression. The interpretation of the term "malicious" in § 523(a)(6) is too important to cast aside through the majority's avoidance treatment and misreading of a district court opinion without even acknowledging the substantial weight of authority from seven circuit courts (Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh) that goes against the majority's affirmance of the district court's and bankruptcy court's construal of "mali-

cious" in § 523(a)(6). Furthermore, Scarlata's debt, created through fraud, is not the type of debt that should be discharged to give the debtor a fresh start, for Scarlata *under no stretch of the imagination can be considered as the typical, honest debtor who is unable to pay his debt because of unfortunate or·accidental circumstances.* Rather, he is nothing but an *unscrupulous gambler* who is taking advantage of an unfortunate but honest creditor with a reasonably foreseeable loss. The judgment of the bankruptcy judge, the trier of fact, whose factual findings must be reviewed under the clearly erroneous standard had the opportunity to view the witnesses and hear and weigh their testimony, should be affirmed as to § 523(a)(2)(A) and the judgment of the district court reversed on the ground that Scarlata's debt to Goldberg is non-dischargeable because he incurred it through a fraudulent representation; the judgment of both·courts as to the dischargeability under § 523(a)(6) should be reversed because the debt arose from a willful and malicious injury to Goldberg's property. Thus, I dissent.