In re Gary E. BRAWNER and Judith A. Brawner, Debtors.

**SIGNET BANK CARD CENTER, Plaintiff,**

v.

**Gary E. BRAWNER, Defendant.**

Bankruptcy No. 90 B 31084.
Adv. No. 90 A 3122.

United States Bankruptcy Court, N.D. Illinois, W.D.

March 5, 1991.

Herbert I. Greene, Rockford, Ill., for plaintiff.

Keith S. Morse, Rockford, Ill., for defendant.

## MEMORANDUM OPINION

RICHARD N. DeGUNTHER, Bankruptcy Judge.

This matter comes before the Court on the Complaint to Determine Dischargeability of Debt, filed by the Plaintiff, Signet Bank Card Center (Signet). Attorney Herbert I. Greene represents Signet. Attorney Keith S. Morse represents the Defendant–Debtor, Gary E. Brawner (Debtor).

This Memorandum Opinion represents statements of fact and conclusions of law, pursuant to Bankruptcy Rule 7052.

## BACKGROUND

On June 8, 1990, the Debtor, with his wife, Judith A. Brawner, filed a Voluntary Petition for bankruptcy relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (1988) (Code). The Debtor and his wife listed Signet as the holder of an unsecured claim for $3,700.00, on their Schedule A–3. Signet was listed as one of sixteen unsecured creditors holding a total of $28,148.13 in claims.

On September 4, 1990, Signet filed its Complaint, seeking to hold its claim non-dischargeable. The Complaint states its claim is for $2,079.84 in cash advances and finance charges along with $1,236.59 in "purchases" and finance charges. Signet's claim arose from the Debtor's use of a Signet-issued Visa card.

On November 10, 1989, the Debtor returned a "Signet Bank Acceptance Certificate" which had been addressed to the Debtor, offering a "Credit Line up to: $5,000" until January 31, 1990. Plaintiff's Ex. 1. On January 28, 1990, Signet issued its first statement to the Debtor, indicating an $18.00 membership (card) fee, a minimum payment due of $10.00, an annual 19.8% rate of interest, and a credit limit of $3,500.00. Plaintiff's Ex. 5.

On February 28, 1990, Signet issued its second statement, indicating a previous balance of $18.00, a cash advance of $2,000.00 on February 16, 1990, six purchases totaling $169.22 between February 11 and February 19, 1990, and a minimum payment due of $76.00. Plaintiff's Ex. 4.

On February 14 and 19, the Debtor made two purchases. *Id.*

On March 28, 1990, Signet issued its third statement, indicating a previous balance of $2,202.43, nine purchases totaling $1,010.56 between February 22 and March 9, 1990. Plaintiff's Ex. 3. In this period, the Debtor charged $857.74 for hotel stays in one Ramada Inn and three Holiday Inns, in four different states. *Id.* The Debtor also charged a $71.13 tab at Bristol Bar and Grill in Kansas City, Missouri, and a $46.88 bill owed to Sonco & Sons Pools in Loves Park, Illinois. *Id.* Each charge was on a different day. *Id.* This third statement called for a minimum payment of $173.00.

On April 28, 1990, Signet issued a fourth statement, indicating a previous balance of $3,263.67, no new charges, and a minimum payment due of $272.00. Plaintiff's Ex. 2.

This statement also indicated it was Signet's "third and final notice" where the Debtor's account was "seriously past due," calling for payment within seventy-two hours. *Id.* The Debtor never forwarded a payment to Signet. Signet cancelled the Debtor's credit line when it received notice of the Debtor's filing.

In challenging discharge, the Complaint alleges the use of "false pretenses, a false representation, or actual fraud" by the Debtor in securing credit. The Complaint also alleges the lack of either an ability to repay or a reasonable intent to repay.

The Debtor denies the allegations and argues that much of the debt owed to Signet resulted from attempts to secure employment out-of-town and that the Debtor simply became entangled in his debt, providing for "a classic case of bankruptcy."

The Debtor earned about $80,000 in 1988 as a new car manager at a local dealership. In 1989, sales slumped and the Debtor earned about $57,000. The Debtor lost his job on February 20, 1990, and became employed at another local dealership on March 20, 1990. In 1990, the Debtor earned about $36,000.

The Debtor had been accustomed to experiencing lucrative months of April. (The Debtor's income corresponded to his sales.) When the Debtor did not experience a sufficiently lucrative April of 1990, he proceeded to consult an attorney regarding bankruptcy relief.

## DISCUSSION

■ Section 727 of the Code generally provides Chapter 7 debtors with a discharge of their debts. Section 523 of the Code provides exceptions to discharge. Courts construe the "discharge provisions" of Section 523 strictly against creditors and liberally in favor of debtors. *In re Winston*, 114 B.R. 566, 569–70 (Bankr.N.D.Ill. 1990). Similarly, courts construe exceptions to discharge strictly "to further the policy of affording a debtor a broad discharge and an effective fresh start." *Id.* at 570. Yet, "the [Code] limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'" *Grogan v. Garner*, — U.S. ——, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)).

Section 523(a)(2)(A) of the Code, however, precludes a discharge "for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by ... false pretenses, a false representation, or actual fraud." To preclude a discharge under Section 523(a)(2)(A), a plaintiff must prove three elements:

First, the creditor must prove that the debtor obtained the money through representations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation.... The creditor also must prove that the debtor possessed scienter, *i.e.*, an intent to deceive.... Finally, the creditor must show that it actually relied on the false representation, and that its reliance was reasonable....

*In re Kimzey*, 761 F.2d 421, 423 (7th Cir. 1985) (citations omitted); *accord In re Cloud*, 107 B.R. 156, 159 (N.D.Ill.1989); *In re Iaquinta*, 98 B.R. 919, 923 (Bankr.N.D. Ill.1989). The United States Supreme Court has recently decided that the plaintiff must prove its case under Section 523(a)(2)(A) by a preponderance of the evidence. *Grogan*, 111 S.Ct. at 659.

In cases which involve credit card debts, Judge Schmetterer has further specified five elements which must be proven to deny dischargeability under Section 523(a)(2)(A):

(a) Debtor made a materially false representation of fact;

(b) Debtor knew the representation was false;

(c) Debtor made the representation with intent to defraud the creditor,

(d) The creditor actually and reasonably relied upon the representation; and

(e) As a result of such reliance the creditor suffered a loss or was otherwise

damaged, i.e. the creditor relied to its detriment upon debtor's false representation.

*In re Williams,* 85 B.R. 494, 496 (Bankr.N. D.Ill.1988).

■ Using a credit card implies a representation by a debtor that the debtor intends to pay, and the creditor reasonably relies on that representation. *Id.* Fundamentally, the question becomes "whether or not the debtor intended to pay for the property or services or to repay the money advanced at the time the debtor used the credit card." 1 R. Ginsberg, *Bankruptcy: Text, Statutes, Rules,* § 11.06(d)(2), at 909–10 (2d ed. Supp.1990).

■ In determining a debtor's intent to defraud a credit card creditor, courts look for guidance in all of the facts and circumstances of each case. *Id.* at 908. Courts have generally looked at six factors:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of credit charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges are made; and

6. Whether the charges were above the credit limit of the account.

*Williams,* 85 B.R. at 499; *accord Cloud,* 107 B.R. at 160; *In re Sutliff,* 112 B.R. 680, 682 (Bankr.M.D.Pa.1990). In *Sutliff,* Judge Gibbons recognized six additional factors:

7. Did the debtor make multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for unemployment;

10. Financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.

112 B.R. at 683. Additionally, in certain cases, the list should address the debtor's relationship with the creditor (i.e., how was the relationship established and how was it maintained). The list, however, should neither provide a bright-line minimum nor be exhaustive. *See, e.g., Williams,* 85 B.R. at 499. ("It is not necessary that all of the aforementioned [first six factors, at least] exist before a Court can find an intent to deceive.").

Here, the Debtor and his wife filed their Voluntary Petition ninety-one days after the Debtor's last charge. The Debtor did not consult an attorney regarding the filing of a petition until well after his charges were incurred. The Debtor charged fifteen purchases and made one cash advance over a period of twenty-seven days. Signet's claim is for $3,316.43, $183.57 under his credit limit and approximately 9% of his earnings in 1990 (and 6% of his earnings in 1989). The financial condition of the Debtor was questionable, based on the loss of his job along with expectation of new, profitable employment. The Debtor's charges never exceeded his credit limit.

Furthermore, the Debtor charged items twice on the same day on two different occasions. Most of the Debtor's charges were incurred before the Debtor became unemployed. The Debtor's prospects for employment seemed to be good in February and March, 1990, with, at least, out-of-town interviews and eventual employment. The Debtor was financially sophisticated as a salesman in the "high-priced" automobile market. The Debtor experienced a sudden change in buying habits in one main regard: out-of-town accommodations, but this change occurred with hopes of securing employment. None of the purchases were necessarily "luxury goods," and all were arguably necessary.

Finally, the Debtor's relationship with Signet also sheds light on the Debtor's intentions. Signet offered the Debtor the opportunity for credit card usage. Signet set its annual rate of interest at 19.8%. Outside of the initial membership fee, two

statements detailed all of the Debtor's purchases and cash advances. Signet sent a "warning" to the Debtor on the fourth statement it issued. Signet never telephoned the Debtor. Signet only revoked the Debtor's credit card upon receiving notice of the filing of the Voluntary Petition.

Although the Court does not condone the Debtor's failure to forward any payments, the Court believes that the Debtor became entangled in a classic case of bankruptcy. Signet has failed to prove that the Debtor intended to defraud Signet. (Compare, for example, *Sutliff,* 112 B.R. at 683, where Judge Gibbons held a credit card debt nondischargeable as the debtor had charged approximately 134 separate items over two months, while unemployed during this period and exceeding his credit limit during approximately half of the purchases.) By contrast, the Debtor here was not necessarily in a hopeless or desperate situation; instead, the Debtor utilized the credit Signet offered with hopes of recovering from a turning point in his career.

Accordingly, the Debtor should be able to discharge the debt he owes to Signet. An Order consistent with this Memorandum Opinion is filed herewith.