**In re Thomas BERZ, Debtor.**

**FCC NATIONAL BANK, Plaintiff,**

**v.**

**Thomas BERZ, Defendant.**

**Bankruptcy No. 93 B 22299.**
**Adv. No. 94 A 00117.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Oct. 21, 1994.

---

William J. Moroney, Law Offices of Law-
rence Friedman, Chicago, IL, for plaintiff.

Herbert H. Victor, Chicago, IL, for defendant/debtor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

Following trial on the merits of the captioned Adversary proceeding, both sides having rested and the evidence and argument of the parties having been considered, the Court now makes and enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Plaintiff FCC National Bank ("Plaintiff") is a financial institution licensed to transact business in the State of Illinois.

2. Defendant Thomas Berz ("Defendant") is the Debtor in his related bankruptcy proceeding filed on October 25, 1993, under Chapter 7 of the Bankruptcy Code.

3. Several years before the bankruptcy proceeding was filed, Defendant requested and received from Plaintiff a credit card, account number 4678–057–011–610 ("first account"). Defendant also requested and received from Plaintiff another credit card, account number 5286–3008–1053–3958 ("second account"). The credit limits on these accounts were $8,000.00 and $7,000.00, respectively. In 1992, Debtor obtained about $10,000.00 in cash advances on these two cards for vacation purposes. These obligations were promptly paid by his father.

4. As Debtor admitted at trial, at all times mentioned herein, he was unemployed and lived mainly on the largesse of his father. He was last employed in 1985. His father purchased seats for him on different commodity or stock exchanges, but he lost or sold those and dissipated the proceeds thereof several years before his credit card transactions in 1993. He had no income and no expectation of income to cover his credit card debt other than the hope that his father would continue to cover his obligations. By his own account, since 1985 he was and remains an unemployed wastrel.

5. As of May 15, 1993, there was no balance due on the first credit card account. As noted earlier, this account had a credit limit of $8,000.00. Commencing on or about May 24, 1993, the Debtor obtained a cash advance with this credit card in the amount of $6,000.00, and then used the card to obtain additional cash advances totaling $2,500.00. The last of those transactions occurred on September 30, 1993, less than a month before Defendant filed his Chapter 7 bankruptcy petition.

6. With respect to the second account (with a credit limit of $7,000.00), on May 24, 1993, the Defendant used that card to obtain a cash advance in the amount of $6,000.00. Significantly, this transaction occurred on the same date and in the same amount as the first cash advance on the other credit card. Thereafter, during a period from June 15, 1993, through September 30, 1993, Defendant used the second credit card to obtain additional cash advances totaling $1,700.00.

7. With respect to the first account, Defendant made payments totaling $320.80 in July of 1993, and one payment of $1,000.00 in September of that year. With respect to the second account, during a period from June 15, 1993, through September 16, 1993, Defendant made payments totaling $945.00. However, sometime in September of 1993, his father told Debtor he could expect no further financial assistance, and the balances due on these credit cards were never paid. Debtor testified that he did not know until after incurring the debts in issue that his father would finally cut off his largesse.

8. At the time he filed in bankruptcy, Debtor had exceeded the credit limit on his first account by $730.00 and exceeded the credit limit on his second account by $750.37. Debtor's voluntary bankruptcy petition scheduled unsecured claims against him in a total amount of $31,900.00. All of that scheduled unsecured debt was incurred on various credit card accounts opened by several credit companies, including accounts involved in this case.

9. Defendant admitted that almost all of the foregoing funds obtained by his use of the two credit cards in 1993 were used to take an extended vacation during which he

also claims vaguely to have looked for work or the possibility of relocation. Defendant also testified vaguely that he had expected his father to give him $25,000.00 sometime during August 1993. This never came to pass. His father did not testify at all, and Debtor did not establish any specific, let alone firm, commitment by his father to pay him that amount or any lump sum gift.

10. At the time of the filing of his related bankruptcy proceeding in Chapter 7, Debtor had no current income, had applied for Social Security disability, and received money from his father as needed to maintain a minimum standard of living. In 1992, his father did establish an allowance for him of $2,000.00 per month, and this was evidently forthcoming regularly and could be relied on by Debtor. However, Schedule J, which was filed in his bankruptcy proceeding, indicated that Debtor had total monthly expenses of $1,780.00. Since he lived partially on credit card advances and his cumulative credit card debt far exceeded his ability to pay, it is clear that Debtor was living far above the rate of his scheduled living expenses. At best, his father's allowance barely covered his living expenses if he were to rein in his spending sharply, leaving little, if anything, left over to pay any unusual debts like those involved here. Debtor knew the $2,000.00/month allowance would not cover his credit card debts as he fell further and further behind on those cumulative credit card debt.

11. Any facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### A. *Jurisdiction*

This matter is before the Court pursuant to 28 U.S.C. § 157, and is referred here under Local District Court Rule 2.33. The Court has subject matter jurisdiction under 28 U.S.C. § 1334, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

### B. *Conclusions of Law*

■ Under Section 523(a) of the Bankruptcy Code, Title 11 U.S.C., a creditor must prove by a preponderance of the evidence all elements required in determining discharge-ability of debt in bankruptcy. *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). The party seeking to establish an exception to discharge of a debt bears the burden of proof. *In re Martin,* 698 F.2d 883, 887 (7th Cir.1983).

Section 523 provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt ...

(2) for money, property, services, or an extension renewal or refinancing of credit to the extent obtained by—

(A) False pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

■ In order to except the debt from discharge under section 523(a)(2)(A) of the Bankruptcy Code, a creditor must establish three elements: (a) the debtor obtained the money or credit through representations either knowingly false or made with such reckless disregard for the truth as to constitute willful misrepresentation; (b) the debtor possessed an actual intent to deceive; and (c) the creditor actually and reasonably relied upon the false representation. *Matter of Scarlata,* 979 F.2d 521, 525 (7th Cir.1992) (citing *In re Kimzey,* 761 F.2d 421, 423 (7th Cir.1985)); *In re Iaquinta,* 98 B.R. 919 (Bankr.N.D.Ill.1989) (Squires, J.).

■ The use of a credit card implies a representation of intent and ability to pay and reasonable reliance thereon by the card issuer. *In re Brawner,* 124 B.R. 762, 765 (Bankr.N.D.Ill.1991) (DeGunther, J.); *In re Williams,* 85 B.R. 494, 496 Bankr.N.D.Ill. 1988) (Schmetterer, J.).

■ Whether a debtor intended to pay for debts incurred by the use of a credit card, or did not and thereby defrauded the creditor, depends on all circumstances surrounding the transactions and the debtor's personal situation. *Id.*

■ A number of possible factors may be weighed in determining whether there was intent to repay, including but not limited to:

1. The length of time between the credit card charges made and the filing in bankruptcy (here between one and five months for the various charges);

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made (not established here);

3. The number of credit card charges made (applicable here);

4. The amount of the charges (certainly applicable here considering the amount of charges compared to Debtor's income stream);

5. The limited financial condition of Debtor at the time the charges were made;

6. Whether the charges exceeded the credit limit of the account (they did);

7. Whether the debtor made multiple charges on the same day, to show evidence of a spending spree (he did);

8. Whether or not the debtor was employed (he was not);

9. The financial sophistication of the debtor (applicable here, the Debtor being an educated and advantaged person who formerly managed stock or commodity exchange seats);

10. Whether there was a sudden change in the debtor's buying habits (arguably not applicable here in view of the large credit charges during 1992);

11. Whether the charges were made for luxuries or necessities (here they were for a luxury vacation).

*In re Brawner*, 124 B.R. at 765. One or two of these factors alone could be sufficient to convince a court that an intent to deceive exists, particularly if the facts of the case are egregious. *In re Deloian*, 60 B.R. 161, 163 (Bankr.N.D.Ill.1986) (Toles, J.); *In re Singleton*, 37 B.R. 787, 797 (Bankr.D.Nev.1984). Here, the first, third, fourth, fifth, sixth, seventh, eighth, ninth, and eleventh factors described above apply to weigh against Defendant.

■ The burden on the creditor attempting to show fraud under § 523(a)(2)(A) is to prove that the debtor knew full well that any professed or implied intention to repay was false or was known by the debtor not to be well-grounded, and that he or she nonetheless deliberately used the card to obtain goods or money that he or she knew were beyond his or her ability to pay. *In re Shanahan*, 151 B.R. 44, 47 (Bankr.W.D.N.Y. 1993). If the creditor can make such a showing, then a professed intention to repay on the part of the user, or even highly positive hopes and plans to repay, does not purge an otherwise sophisticated cardholder's actions of fraud. The fact that one has profoundly fooled oneself with regard to prospects for the future should not mean that any consequent damage to others was merely inadvertent and not fraudulent. *Id.*

Thus, the issue here is whether, under a totality of the circumstances analysis, this debtor had a reasonable belief in his intent and ability to repay the debt.

■ Given the evidence presented here, it is quite obvious that Debtor did not have a reasonable expectation of his ability to repay the credit card debts owed to the Plaintiff in this case. At all times mentioned, Debtor was insolvent. He was insolvent when he took the initial cash advances in May 1993, and he was insolvent at the time he filed the case on October 25, 1993. By his own testimony, Defendant demonstrated that he was unable to pay the debts to this creditor when he used the credit cards. He was unemployed and expected that his father would pay his heavy credit card bills, as his father had done for him in the past. He testified that he hoped to receive a gift of $25,000.00 from his father sometime in August of 1993, but established no specific or firm commitment by his father to give more than the $2,000.00 monthly allowance. He exceeded the credit limits for each of the credit card accounts.

It is clear that Debtor had no intention or reasonable expectation of repaying the debts due Plaintiff in this case. He expected his father to repay these debts, despite lack of any firm advance promise from his father to do so. He did not claim that he had received such a specific promise, and his father was not called to testify. Moreover, the cash

advances taken on the cards issued by Plaintiff were not for necessities but were for the luxury of an extended vacation. His talk of looking for relocation opportunity during the vacation was too vague to place much weight on it, particularly given his irresponsible adult history.

Debtor testified that in August of 1992 he had reached an accommodation with his father that he would receive $2,000.00 per month as an allowance. Accepting that as accurate, this accommodation was in place at the time of the transactions involved in this case. That paternal arrangement can indeed be construed as analogous to an employment situation, because it was a reasonable expectation of steady income until it was cut off. Even assuming that, however, the amounts of those promised payments were not enough on which to base reasonable expectation of an ability to pay the credit card debts involved here. The amounts of those debts clearly exceeded any expectation of repayment, given Debtor's need to use that limited "income" stream from his father for ordinary living expenses.

This Debtor lacked any employment income at all since 1985. He had barely sufficient income from his father to meet his ordinary monthly needs and no reasonable basis to anticipate an increase in income. Clearly, Debtor here had insufficient "income" of any sort to meet the obligations he incurred on the credit cards in question. His expectation that his father would cover these debts by a lump payment as he covered similar debts in 1992 was a mere hope unsupported by paternal commitment. Defendant therefore had no intention of repaying Plaintiff. To the contrary, it was his hope that someone else would repay these debts, a hope not supported by anyone's specific commitment.

 As to any suggestion or implied argument that Defendant here lacked the mental capacity to perpetrate the fraud on this creditor due to some form of mental illness, it must be pointed out that no medical testimony supported any such argument. Debtor's self-serving testimony was not credible or specific and did not demonstrate that he suffers from any medically recognized mental illness. While recognized mental problems can well make credible a debtor's asserted reasonable belief in ability to pay, *In re Fontenot,* 89 B.R. 575, 581 (Bankr.W.D.La. 1988), some competent medical evidence would be required to lend weight and substance to that defense.

Moreover, a recent opinion is instructive. *In re Borste,* 117 B.R. 995 (Bankr. W.D.Wash., 1990). There the defendant attempted to impose a capacity defense based upon obsessive/compulsive disorder. The court responded:

> One cannot help but be sympathetic toward the debtor, but the disorder does not relieve her of responsibility for her behavior. In short, the Court concludes that the debtor's conduct showed a reckless disregard for the truth, namely that she continued to incur charges at Nordstrom after she knew or should have known that she lacked the ability to pay.

117 B.R. at 1001.

The same can be said of the Debtor in this case.

Even as parents sometimes cut off their children from largesse in an effort to encourage acceptance of responsibility, so the Bankruptcy Code imposes responsibility on this Defendant for his reckless and wanton financial behavior.

### CONCLUSION

For the foregoing reasons, this Court finds, after giving credit for all payments made on the credit card accounts, judgment shall separately be entered in favor of Plaintiff FCC National Bank and against Defendant Thomas Berz in the total amount of balances due on the accounts involved there, amounting to $13,934.20 for prepetition credit card advances taken by Defendant on the two cards in question. The total debt arising therefrom will be adjudged non-dischargeable under 11 U.S.C. § 523(a)(2)(A).