In re Cheuk Hon WONG, Debtor.

**AT & T UNIVERSAL CARD SERVICES CORP., Plaintiff,**

v.

**Cheuk Hon WONG, Defendant.**

**Bankruptcy No. 96–11380SR.**
**Adv. P. No. 96–668.**

United States Bankruptcy Court,
E.D. Pennsylvania.

April 14, 1997.

Gloria Satriale, Chester Springs, PA, for Trustee.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Introduction.

The instant matter is before the Court by way of a complaint filed by AT & T Universal Card Services ("AT & T") against debtor Cheuk Hon Wong (the "Debtor"). AT & T brings this suit under § 523(a)(2)(A) of the United States Bankruptcy Code ("Code"), 11 U.S.C. §§ 101–1330, seeking to except from the Debtor's discharge a certain debt which arose from the Debtor's use of an AT & T Universal Gold MasterCard. After completing a trial of this adversary proceeding on January 22, 1997, the Court took the matter under advisement. For the reasons set forth below, the Court finds the majority of the debt owed to AT & T by the Debtor to be nondischargeable under Code § 523(a)(2)(A).

### JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this core proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. §§ 157(a), 157(b)(1) and 157(b)(2)(A), (I) and (O).

### BACKGROUND

The key facts relevant to the matter now under consideration are not in dispute. In or about December 1990 the Debtor applied for an AT & T Universal Gold MasterCard. Admitted into evidence as Exhibit P–1 was the Debtor's AT & T credit card application. The application, dated December 15, 1990, reflects, among other financial and personal information, that the Debtor owned the real property listed as his address, and that his annual income was $36,000. Sometime after the application was submitted, AT & T issued the Debtor an AT & T Universal Gold MasterCard (the "Credit Card").

Admitted into evidence, as Exhibit P–3, were copies of the Debtor's Credit Card account statements for the months of March through September, 1995. A review of these

Harry C. Citrino, Philadelphia, PA, for Debtor.

account statements reveals that the Debtor's credit limit at the time was $10,500. Of particular importance hereto are the account statements for the periods ending on March 10 and April 10, 1995, respectively. Focusing initially on the March statement, the Court observes that the balance due on the account at the beginning of the billing period, February 11, 1995, was $10,408.05. The March statement also reveals that a significant payment in the amount of $9,858.78 was credited against this large outstanding balance five days later on February 16, 1995. Also apparent from this statement is the fact that at or about the time that the account balance was reduced to only a few hundred dollars by the above payment, the Debtor had already begun to incur substantial new charges on the account. As a result of these new charges, the balance due on the account had swelled to $10,354.33 by the end of the billing period on March 10, 1995. The amounts billed to the account on or before this date were inclusive of a $400 cash advance at the Trump Plaza Casino in Atlantic City, two "convenience checks" in the amounts of $4,000 and $5,000 respectively (treated as cash advances under the AT & T Universal Card Credit Agreement (the "Credit Card Agreement"), *see* Exhibit P–2), cash advance fees, and a single purchase in the amount of $254.76. The minimum amount that the Debtor was required to pay against the $10,354.33 closing balance was $217. The due date for this payment was April 4, 1995.

On or before the due date for the April payment, however, the Debtor incurred numerous additional charges on the account. These additional charges were inclusive of cash advances totaling $1,500, related cash advance fees, and purchases aggregating $1,188.01. The balance due on the account as of the end of the billing period, April 10,

1995, was $13,243.49. No other purchases were made, nor were any other cash advances taken, after the close of this billing period. The only other sums added to the account after the April statement were finance charges, and late payment and over the limit fees levied by AT & T. As of the account statement for the period ending on September 10, 1995, Exhibit P–3, the balance due on the account was $14,392.62, inclusive of all fees and late charges billed up to that point.

The Debtor admits that he made, or authorized, all of the above purchases and/or cash advances. He also admits that his last payment on the account was the $9,858.78 payment credited on February 16, 1995.

The Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on February 21, 1996, nearly eleven months after his final charge on the account. Exhibit P–4. The bankruptcy schedules attached to the Debtor's petition reveal that at the time that the petition was filed the Debtor: a) did not own any real property (Schedule A); b) had personal property valued at only $1,100 (a checking account with a balance of $900 and wearing apparel valued at $200) (Schedule B); c) claimed exemptions under Code § 522(d) covering 100% of the personal property listed in Schedule B (Schedule C); d) had unsecured non-priority claims totaling $145,294 (the majority of which appears to be owed to various credit card issuers) (Schedule F); e) had three dependent children aged 4, 11 and 12, and net monthly income of $800 (Schedule I); f) and monthly expenses totaling $765 (Schedule J). On Schedule D, added to the petition by praecipe filed on March 28, 1996, the Debtor listed no secured claim holders.[1]

The amended statement of financial affairs filed by the Debtor on January 29, 1997,[2]

---

**1.** Still missing from the Debtor's petition, however, are Schedule E (creditors holding unsecured priority claims), Schedule G (executory contracts and unexpired leases), and Schedule H (codebtors). The Debtor is directed to file these bankruptcy schedules, and an amended summary of schedules if necessary, within thirty days of the date of this Opinion. The United States Trustee is directed to monitor compliance with the foregoing directive.

**2.** At the trial, AT & T argued that the Debtor's statement of financial affairs was incomplete because the Debtor failed respond to certain questions concerning his income and employment during the two years prior to the filing date of his petition. At the conclusion of the trial the Court directed the Debtor to file an amended statement of financial affairs, and reserved the right to reconvene the trial, if necessary, pending its review of the amendment filed. Upon review of

reflects that in 1996, the Debtor's income for the two months prior to the filing date of his bankruptcy petition was $2,400 (income for January and February; annualized to $14,400), and that his income for the two years preceding bankruptcy was $14,600, in 1995, and $17,400, in 1994.

AT & T commenced this adversary proceeding by the filing of a complaint on May 17, 1996, seeking judgement against the Debtor in the amount of $14,636.18, interest at the contract rate from November 10, 1995 (presumably ceasing to accrue as of the filing date of the Debtor's bankruptcy petition), and judgment declaring such debt to be nondischargeable pursuant to Code § 523(a)(2)(A). AT & T called only one witness to testify in support of its case, Gary Walters ("Walters"), its Corporate Investigations Manager. Although much of Walters' testimony concerned factual matters that were not in dispute, he did, however, provide testimony concerning certain "computer notes" maintained by AT & T in the regular course of its business which purportedly related to the Debtor's account. Walters testified that the computer notes were an accurate record of the notations contemporaneously typed into the computer system by the various AT & T Universal Card customer service representatives as they either worked on the Debtor's account or spoke with the Debtor on the telephone regarding

same. Relying on the information contained in the computer notes, AT & T contends that there was nothing in the history of its prior dealings with the Debtor to suggest fraud or credit card abuse, or that would have put it on notice that the Debtor would simply fail to pay for amounts billed to the account after February 1995.

In response to the Debtor's objection to the admissibility of the computer notes on the basis of unfair surprise, AT & T admitted that it had not disclosed the computer notes to the Debtor at any time before trial, nor had they been mentioned in the joint pre-trial statement that was apparently filed on the morning of trial.[3] AT & T argued, however, that the computer notes were admissible into evidence under the "business record" exception to the hearsay rule. *See* Rule 803(6) of the Federal Rules of Evidence ("Fed.R.Evid."). The Debtor ultimately waived the unfair surprise argument, concentrating instead on the argument that in relying solely on the testimony of Walters to introduce the computer notes into the record at trial, AT & T had failed to lay a proper foundation for their admittance into evidence as a business record. The Debtor posits that a proper foundation for the computer notes could have only been established by the testimony of the persons whose comments are reflected therein. The Court had the computer notes, which were apparently brought

the relevant data contained in the amended statement of financial affairs, which the Debtor filed on January 29, 1997, the Court concludes that it can decide the instant matter based on the representations made therein, and that accordingly, it will not be necessary to reconvene the trial. The Court notes, however, that the statement of financial affairs, as amended, is still not complete due to the continued existence of numerous unanswered questions and the failure of the Debtor to sign or otherwise verify the amendment. The Debtor is therefore directed to file a supplemental amendment to the statement of financial affairs which addresses the foregoing deficiencies within thirty days of the date of this Opinion. The United States Trustee is directed to monitor compliance with the foregoing directive.

3. At the trial, the Debtor brought to the Court's attention that the joint pre-trial statement filed on January 22, 1997 (the day of the trial) was actually the unilateral work product of AT & T, that it was filed without any input from the Debtor, and that the Debtor had only received a

copy of the document after 6:00 p.m. on January 21, 1995, literally on the eve of trial. Upon inquiry by the Court, AT & T unhesitatingly admitted the foregoing allegations. After admonishing AT & T that there was actually nothing "joint" about the joint pre-trial statement that it filed, and that the document should have been filed months earlier (the joint pre-trial statement was due on October 18, 1996, *see* Pre–Trial Order of July 1, 1996), the Court inquired of the Debtor concerning his preparedness for trial under these circumstances. The Debtor responded that he was prepared to go forward with the trial provided that AT & T would stipulate to admit his bankruptcy petition into evidence and the following additional facts: a) that the Debtor opened the Credit Card account in 1990; b) that he made his last payment on the account in February 1995; c) that he did not use the Credit Card after March 1995; and d) that he filed his Chapter 7 bankruptcy petition in February 1996. AT & T so stipulated, and the trial went forward as scheduled.

to the trial by Walters, marked as Exhibit P–5 by the court reporter, and conditionally admitted them into the record subject to a determination as to their admissibility as a business record under Fed.R.Evid. 803(6).

On the merits, the Debtor argues that this is not a case involving fraudulent use of a credit card followed thereafter by bankruptcy to discharge the resultant debt. Rather, he contends that his failure to pay AT & T was simply the result of financial insolvency which in turn rendered him unable to meet all of his expenses, including the debt owed to AT & T. Thus, he contends that there was no fraudulent intent on his part not to pay AT & T for the charges and cash advances incurred on the account at the time that they were made. Moreover, he contends that the filing of his Chapter 7 bankruptcy petition, nearly one year after his last use of the Credit Card, was proper under the circumstances since the bankruptcy system is "set up so that people can get out from under their debt." Transcript, p. 29.

## DISCUSSION

It has long been held that one of the primary purposes of the Bankruptcy Code is to "provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a 'new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (quoting *Local Loan v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). This "fresh start" principle of the Bankruptcy Code, as it is often referred to, is not without exception, however, as certain acts or conduct of the debtor can lead to the forfeiture of the opportunity afforded by the Code to be discharged from some, or possibly all, of the debtor's debts. *See e.g.,* 11 U.S.C. §§ 523(a) and 727(a).

Relevant to the matter *sub judice* is Code §§ 523(a)(2)(A) which provides, in pertinent part, that a discharge under Code § 727 does not discharge an individual debtor from any debt:

(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

■ In order to foster the fresh start principles embodied in the Code, courts are required to construe the provisions of Code § 523(a)(2)(A) liberally in favor of the debtor and strictly against the creditor. *In re Cohn,* 54 F.3d 1108, 1113 (3rd Cir.1995); *accord In re Aste,* 129 B.R. 1012, 1016 (Bankr. D.Utah 1991). The foregoing admonition, however, relates only to the standard of statutory construction applicable to the exception to discharge provisions of Code § 523(a), and does not relate to the standard of evidentiary proof required in cases applying such provisions. *In re Aste,* 129 B.R. at 1016.

■ To succeed on a claim under Code § 523(a)(2)(A), the objecting creditor must prove by a preponderance of the evidence, *Grogan v. Garner,* 498 U.S. at 287–88, 111 S.Ct. at 659–60, that: (1) the debtor made a representation to the creditor; (2) the debtor knew the representation was false at the time it was made; (3) the debtor made the representation with the intention and purpose of deceiving the creditor; (4) the creditor relied on such representation; and (5) that the creditor sustained the alleged loss and damage as a proximate result of the false representation having been made. *See e.g. In re Bergman,* 103 B.R. 660, 670–71 (Bankr. E.D.Pa.1989); *In re Stelweck,* 86 B.R. 833, 846 (Bankr.E.D.Pa.1988), *aff'd sub nom. U.S. v. Stelweck,* 108 B.R. 488 (E.D.Pa.1989)). The foregoing elements mirror those required to be shown to prove common law fraud. *See generally In re Eashai,* 87 F.3d 1082, 1087 (9th Cir.1996); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts, at 728 (5th ed. 1984), *see also Field v. Mans,* —— U.S. ——, ——–——, 116 S.Ct. 437, 443–44, 133 L.Ed.2d 351 (1995) (stating that the operative terms in Code § 523(a)(2)(A) "false pretenses, a false representation, or actual fraud" are common law terms which imply

elements that the common law has defined them to include).

■ With respect to the first element above, this Court continues to adhere in principle to the approach adopted by the majority of courts in Code § 523(a)(2)(A) cases wherein the debtor's use of a credit card is at issue.[4] This approach, often referred to as the "implied representation" theory, *see e.g., In re Eashai,* 87 F.3d at 1086; *see also In re McDonald,* 177 B.R. 212, 216 (Bankr.E.D.Pa. 1994) (wherein this Court adopted the implied representation theory), holds that each use of a credit card constitutes an implied representation by the card holder that he or she has both the intent and the ability to repay the debt created by such use. *See e.g., In re Berz,* 173 B.R. 159, 162 (Bankr.N.D.Ill. 1994); *In re Branch,* 158 B.R. 475, 477 (Bankr.W.D.Mo.1993); *In re Preece,* 125 B.R.

474, 477 (Bankr.W.D.Tex.1991). Applying this view to the facts of the instant case, the Court finds that on each occasion that the Debtor used the Credit Card between February 13, 1995 (the date on which the first of the purchases and/or cash advances at issue were made) to April 4, 1995 (the date of the last such purchase or cash advance), he made a representation to AT & T that he had both the intent and the ability to repay the debt incurred ostensibly according to the terms and conditions expressed in the Credit Card Agreement. Upon review of the terms and conditions expressed therein, the Court finds that the Debtor was provided with the option of either paying off the entire balance due on the account at any time, or of making at least a "minimum payment" in such amount, and by such date, as specified in the monthly billing statement.[5] Exhibit P–2, at ¶ 9. In

---

4. Notwithstanding the plain language of Code § 523(a)(2)(A) and the seeming straight forward nature of the above principles, the application of the statute under circumstances where the debtor's use of a credit card is at issue has long presented the courts with a conceptual difficulty in ascertaining whether the elements of misrepresentation and reliance have been met. This is largely owing to the nature of the credit card transaction itself which involves three parties, i.e., 1) the debtor/cardholder; 2) the creditor/card issuer; and 3) the merchant or financial intermediary (e.g., a bank through an automated teller machine) that honors the credit card, in contrast to the traditional credit transaction which involves only the debtor and the creditor. The difficulty in credit card cases is for the creditor, who typically does not deal face to face with the debtor, to prove the elements of misrepresentation and reliance. *See e.g. In re Eashai,* 87 F.3d at 1087.

In dealing with the foregoing issues, the courts generally follow one of three main legal theories. The majority approach is the "implied representation theory", the details of which are discussed above in text. The minority approach is referred to as the "assumption of the risk theory". This approach generally holds that the cardholder makes a false representation to the issuer only when revocation of the card has been communicated to the cardholder and the cardholder continues to use the card. *See, e.g., In re Ward,* 857 F.2d 1082 (6th Cir.1988); *First Nat. Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir. 1983). Under this approach, the card issuer assumes the risk that the cardholder will incur debts he or she cannot pay until the issuer communicates to the holder that his or her right to use the card is revoked. The third approach, sometimes referred to as the "totality of the circumstances theory", holds that a court may

infer the debtor's fraudulent intent not to pay for charges made on a credit card if the facts and circumstances of the case paint a picture of deceptive conduct on the part of the debtor. *See e.g., In re Eashai,* 87 F.3d at 1087. The focal point of this approach is the debtor's intent as determined from a consideration of a list of nonexclusive objective factors. *Id.; In re Dougherty,* 84 B.R. 653 (9th Cir BAP 1988).

Each of the above approaches has been criticized by courts that adhere to one of the other approaches or to one of the many other divergent views that do not fit neatly into the above categories. It seems likely that until Congress takes action to establish clear cut guidelines in credit card nondischargeability cases under Code § 523(a)(2)(A), divergent views among the courts will continue to proliferate. Unabated, the current situation will result in increased inconsistency of outcomes among cases resting on similar facts. That such lack of consistency is harmful to the system, should be obvious to all concerned. In the absence of countervailing authority from the Supreme Court or from the Third Circuit Court of Appeals, this Court, as discussed above in text, continues to adhere to the general principles of the implied representation approach.

5. The term "minimum payment" is defined by the Credit Card Agreement as:

> **Minimum Payment.** You must make a Minimum Payment in each Billing Cycle in which you have a New Balance on your account. The Minimum Payment in each Billing Cycle is 2.1% of the New Balance, excluding Calling Card Charges, as shown on your monthly statement, rounded to the nearest whole dollar, plus all Calling Card Charges posted to your account in the Billing Cycle, plus any

either event, however, the Debtor was clearly required to make at least a "minimum payment" to AT & T each month in which there remained an outstanding balance due on the account.

■ The Court has little difficulty in finding that the second element, i.e., that the above representations implied from the Debtor's use of the Credit Card were false, is satisfied here as well. In this regard, a review of the Debtor's bankruptcy schedules and statement of financial affairs reveals that at or about the time when the charges and cash advances at issue were made, the Debtor had net monthly income in the approximate amount of $800, and regular monthly expenses of at least $765.[6] Thus, according to the Debtor's own sworn statements to the Court as contained in his schedules and statement of financial affairs, the Debtor had no more than roughly $35 in disposable income available per month with which to make any current "cash" purchases and to make payments for past purchases that had been made on credit. Disposable income in such amount, however, was grossly inadequate to service the $13,243 debt that had been amassed with the Credit Card as of April 4, 1995, the date of the Debtor's final transaction on the account. The Debtor is plainly chargeable with the knowledge that his monthly income at the time was insufficient to service a debt of this magnitude since on or about February 13, 1995, the date on which he began to incur the charges in question, the balance due on the account was $10,408, a sum of lesser amount, which carried with it a corresponding minimum payment obligation in the approximate amount of $219 (i.e., 2.1% of the balance due is $218.56, see Exhibit P–2, at ¶ 9). Thus, at or about the time that the Debtor began to incur the charges at issue, he knew, or reasonably should have known, that he lacked

the personal financial means to satisfy even the minimum payment requirement corresponding to the newly mounting debt on the account. This circumstance was contrary to the implied representation of an ability to pay made each time that he used the Credit Card.

Moreover, the continued use of the Credit Card under circumstances such as these—wherein the Debtor knew, or reasonably should have known, that he lacked sufficient income to pay even the minimum amount due for the charges and cash advances that he was incurring during the period—evinces a knowing, or at least a reckless, disregard for the truth of the representation implied from such use of the card that he intended pay for the amounts billed to the account according to the terms of the Credit Card Agreement. See In re Flynn, 184 B.R. 8, 9 (Bankr. W.D.N.Y.1995); In re In re Woolley, 145 B.R. 830, 834–35 (Bankr.E.D.Va.1991). The Debtor's disregard for the truth or falsity of the representation made to AT & T under these circumstances, whether knowingly or recklessly made, is sufficient to satisfy the knowing misrepresentation element of Code § 523(a)(2)(A). See In re Woolley, 145 B.R. at 834–35; In re Cohen, 191 B.R. 599, 605 (D.N.J.1996), aff'd 106 F.3d 52 (3rd Cir.1997); In re Berz, 173 B.R. at 162. The Court concludes, therefore, that each time the Debtor used the Credit Card to make purchases or take cash advances between February 13, and April 4, 1995, the Debtor knowingly misrepresented to AT & T that he had both the intent and the ability to repay the debts incurred by such use. See also In re Pursley, 158 B.R. 664 (Bankr.N.D.Ohio 1993) (holding that proof that at the time the debtor used the credit card he knew or should have known that he would be unable to repay the charges incurred constitutes false pretenses, a false representation or actual fraud); In re Meeks, 139 B.R. 559 (Bankr.

unpaid Minimum Payment from prior statements and any amounts which exceed your credit line. However, the Minimum Payment will not be less than $15.00 or the exact amount of your New Balance, if it totals less than $15.00, plus your Calling Card Charges. *You must pay at least the Minimum Payment shown on each monthly statement by the due date to avoid delinquency. You may pay the*

*entire New Balance on your account at any time.*

6. At trial, AT & T argued that the expenses reported by the Debtor on Schedule J were understated to some extent due to the fact that he had budgeted only $100 per month for food, yet he had listed a responsibility for three dependent minor children on Schedule I.

M.D.Fla.1992) (same); *In re Hansbury,* 128 B.R. 320 (Bankr.D.Mass.1991) (same); *In re Lipsey,* 41 B.R. 255 (Bankr.E.D.Pa.1984) (same).

■ The third element of AT & T's Code § 523(a)(2)(A) cause of action requires it to prove that the Debtor had the subjective intent not to repay the debt incurred on the Credit Card. *See Field v. Mans,* — U.S. —, —, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (settling the longstanding controversy over whether objective or subjective intent must be proven in Code § 523(a)(2)(A) non-dischargeability cases by holding that the elements of common law fraud—which require proof of subjective intent—apply). Subjective intent to defraud, however, is an elusive concept to prove since rarely, if ever, will a debtor openly admit a fraudulent intent not to pay for the charges made on a credit card. *See generally In re Cohn,* 54 F.3d at 1118. Faced with this reality, courts often rely on objective criteria as circumstantial evidence of the debtor's intent. *In re Briese,* 196 B.R. 440, 451 (Bankr.W.D.Wis.1996). The most commonly relied on indicia of fraudulent intent in the context of credit card nondischargeability under Code § 523(a)(2)(A) are the twelve nonexclusive factors stated in the oft cited opinion *In re Dougherty,* 84 B.R. 653. The so called "Dougherty factors", as they are sometimes referred to, were recently adopted by the 9th Circuit Court of Appeals in *In re Eashai,* as a means of establishing the fraudulent intent element in credit card nondischargeability cases. 87 F.3d at 1090. The Dougherty factors are as follows:

1. the length of time between making the charges and filing for bankruptcy;

2. whether an attorney had been consulted concerning filing for bankruptcy protection before the charges were made;

3. the number of charges made;

4. the amount of the charges;

5. the financial condition of the debtor at the time the charges were made;

6. whether the charges exceeded the credit limit of the account;

7. whether the debtor made multiple charges in the same day;

8. whether the debtor was employed;

9. the debtor's prospects for employment;

10. the financial sophistication of the debtor;

11. whether there was a sudden change in the debtor's buying habits; and

12. whether the purchases were luxuries or necessities.

In *In re Hashemi,* 104 F.3d 1122 (9th Cir.1996), the Ninth Circuit provided the following commentary on the proper application of the above factors: "[t]hese factors are non-exclusive; none is dispositive, nor must a debtor's conduct satisfy a minimum number in order to prove fraudulent intent. So long as, on balance, the evidence supports a finding of fraudulent intent, the creditor has satisfied this element." *Id.* at 1125. In sum, the foregoing factors are intended to serve merely as an aid in divining the debtor's intent in the use of a credit card from all the surrounding circumstances when such use of the card prior to bankruptcy is called into question in an action under Code § 523(a)(2)(A). *See In re Berz,* 173 B.R. at 162.

Turning to the facts of the instant case, the Court finds sufficient evidence of fraudulent intent in the circumstances attending the Debtor's use of the Credit Card. First, the monthly billing statements reveal that from February 13 to April 4, 1995, the Debtor initiated sixteen transactions on the account totaling approximately $12,421. The amounts billed to the account during the period were inclusive of five cash advances totaling $1,900, two convenience checks totaling $9,000, related cash advance and cash access fees in the amount of $78, nine purchases totaling $1,432.77, and an over the limit fee in the amount of $10. Notably, the purchases and cash advances made during the roughly two month period between the first and last transaction exceeded both the Debtor's projected annual take home pay for 1995 (approximately $9,600, *see* Exhibit P–4, Schedule I) by $2,821, and his listed annual expenses (approximately $9,180, *id.,* Schedule J) by $3,240. Moreover, the Debtor's charging pattern during this period does not seem

to have been hampered in the least by the fact that he had only approximately $35 in disposable income available each month with which to make current and future payments to creditors such as AT & T. As discussed more fully above (in context of the knowing misrepresentation element), the Debtor knew, or had reason to know, that his income at the time was not even close to being able to support the charges and cash advances that he was making with the Credit Card.

The Court also observes that the $9,858.78 payment of February 16, 1995 did nothing to lessen the financial difficulties facing the Debtor because before the month had even ended the Debtor had already incurred substantial new charges on the account in excess of the amount of the payment he had just made. As a result, the balance due on the account by the March 10, 1995 closing date was $10,354, just slightly below the Debtor's $10,500 credit limit. This balance carried with it a minimum payment obligation in the amount of $217 which was due on April 4, 1995. The amount of the minimum required payment should have come as no surprise to the Debtor since the minimum payment that had been due at the beginning of February, when the balance was $10,408, was approximately $219. Prior to the due date for the April payment, however, the Debtor incurred even more debt with the Credit Card bringing the balance due on the account to $13,-243. This amount exceeded the Debtor's credit limit by $2,743. Although the Court can not determine from the monthly statements with any degree of certainty what the charges were for, it appears, however, that

they were not for necessary living expenses since according to Schedule J of the Debtor's bankruptcy petition ordinary living expenses, excluding payments to creditors such as AT & T, were covered by the modest income he was earning. The Court also notes that the Debtor appears to have been financially sophisticated enough to make payments to AT & T each month that he had a balance owning on the account from November 1994, to February 1995. *See* Exhibit P–5.[7] While it is true that the Debtor ceased incurring new debts on the account after April 4, 1995, it is also true that he made no further payments on the account after the payment credited on February 16, 1995. Thus, the cessation of new charges and cash advances came only after he had already exceeded the credit limit by $2,743, and at a time when he was, or was about to become, delinquent on the account.

Finally, the Debtor's bankruptcy petition was filed on February 21, 1996, nearly eleven months after the final cash advance which took place on April 4, 1995. Thus, while it does not appear that the Debtor made the charges or took the cash advances in contemplation of bankruptcy, this factor alone does not overcome the overwhelming evidence in the case that at the time the Debtor incurred such debts, he knew, or should have known, that he could not possibly repay them. Such actions are not those of a person who is in the least bit concerned about whether or not the resulting debt would be paid. Thus, based on an examination of all the surrounding circumstances, the Court concludes that the Debtor's use of the Credit Card bespeaks

---

**7.** The cases are legion in which computer records of all types have been found to be admissible as business records under Fed.R.Evid. 803(6). *See e.g., In re Denslow*, 104 B.R. 761, 764 (E.D.Va.1989) (providing citations to a plethora of decisions from numerous jurisdictions holding computer records of various types to be admissible). Under the Rule, business records are admissible:

> [i]f kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed.R.Evid. 803(6). The Court is satisfied that Walters, an AT & T Corporate Investigations Manager (whose job required him, *inter alia*, to review the computerized records of individuals suspected of credit card fraud), is a "qualified witness" within the meaning of the Rule to lay a proper foundation for, and to testify about information contained within, the computer notes here at issue. *See In re Denslow*, 104 B.R. at 764–66. Contrary to the argument presented by the Debtor, AT & T was not required to produce the individuals whose comments are reflected in the notes or the persons who otherwise participated in the preparation of the record. *Id., accord, In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 288–89 (3rd Cir.1983). To require such proof would defeat the purpose sought to be achieved by the Rule.

his actual fraudulent intent not to pay for the charges and cash advances at issue here. *Accord In re Berz,* 173 B.R. at 163–64.

■ Furthermore, even if the Court were to give the Debtor the benefit of the doubt by concluding that he did not specifically intend not to pay for the charges and cash advances made on the account at the time that they were incurred, the Court would nonetheless still be constrained to find that the Debtor's conduct under the circumstances was sufficiently reckless to infer fraudulent intent. *See e.g., In re Cohen,* 191 B.R. at 605 (stating that bankruptcy courts have generally followed the principle that intent to deceive may be established by showing that the debtor recklessly disregarded the truth). A noted treatise on the subject of torts states that reckless conduct "refers to unreasonable conduct in disregard of a known or obvious risk from which it is highly probable that harm would follow. It is usually accompanied by a conscious indifference to the consequences. In contrast, negligence is characterized as mere thoughtlessness or inadvertence or simple inattention." Prosser & Keeton On Torts, at 213. In the instant case, the Debtor's conduct of incurring debts on the account that he knew, or reasonably should have known, greatly exceeded his ability to pay even the minimum amount due, posed an obvious risk to AT & T from which harm, in the form of nonpayment, was likely to follow. Such conduct goes beyond mere negligence. The Court concludes, therefore, that the Debtor's conduct, in light of all the surrounding circumstances, evinced a knowing, or at least reckless, disregard for whether AT & T would be repaid for the debt incurred on the Credit Card. Such indifference to the consequences of his actions is sufficient to satisfy to the fraudulent intent element of Code § 523(a)(2)(A). *In re Choi,* 203 B.R. 397 (Bankr.E.D.Va.1996); *In re Cohen,* 191 B.R. at 605; *In re Woolley,* 145 B.R. at 834; *see also In re Cohn,* 54 F.3d at 1119 (holding that the intent to deceive element under Code § 523(a)(2)(B) can be inferred from the totality of the circumstances including the debtor's disregard for the truth).

■ With respect to the fourth element of AT & T's cause of action, the Court observes that the Supreme Court in *Field v. Mans* settled another longstanding controversy dividing the courts by holding that Code § 523(a)(2)(A) requires justifiable, not reasonable, reliance. —— U.S. at ——, 116 S.Ct. at 445–46. The Supreme Court explained that the general understanding of fraud incorporated in the statute favors a justifiable reliance standard which turns on a person's knowledge under the circumstances of a particular case. *Id.* at ——, 116 S.Ct. at 444. " 'Justification, is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case rather than of the application of a community standard of conduct to all cases.' " *Id.* (quoting Restatement (Second) of Torts, § 545A, cmt. b (1976)). The Supreme Court also stated that "the Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact 'although he might have ascertained the truth or falsity of the representation had he made an investigation.' " *Id.* (quoting Restatement (Second) of Torts, § 540). The concept of "justifiability" is not without limits, however, as the Supreme Court makes clear: "a person is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.' " *Id.* (quoting Restatement (Second) of Torts, § 541, cmt. a).

In the instant case, the Court finds that AT & T was justified in relying on the above representations because the Debtor had demonstrated by means of the $9,858.78 payment credited to the account on February 16, 1995, that he had the ability to not only maintain the account in good standing by paying the minimum amount required on a balance very near his $10,500 credit limit, but that he also had the ability to significantly reduce the balance owed on the account by making a much larger payment. In other words, the Debtor's actions created the impression of an ability to pay far beyond his actual means. That AT & T's reliance was justified, is further supported by the account history portion of the computer notes which

**832**

reveals that from November 1994 (the earliest segment of account history reflected in the computer notes) through March 1995, the outstanding balance on the Debtor's account ranged from a low of $4,133 (on November 10, 1994) to a high of $10,408 (on February 10, 1995), and that the Debtor made payments to AT & T each month during the period, two of which greatly exceeded the minimum amount due for that month.[8]

■ In contrast to the foregoing conclusion, however, the court finds that AT & T provided no evidence to establish what steps, if any, were taken to determine the credit worthiness of the Debtor for amounts exceeding his $10,500 credit limit. In light of this, the Court finds that AT & T failed to demonstrate that it was in any way justified in relying on the above implied representations as to amounts exceeding the Debtor's credit limit. The court holds, therefore, that AT & T established the reliance element of its cause of action against the Debtor only to the extent of the $10,500 credit limit assigned to the account, plus applicable late fees and finance charges.

Finally, the Court finds that AT & T has proven that it sustained the loss for which it now seeks redress as a proximate result of the above representations having been made. In this regard, the court finds that AT & T established that as a direct result of the Debtor's use of the Credit Card from February 13 through April 4, 1995, the Debtor became indebted to AT & T in the amount of $13,243.49, a sum that has not been paid. As discussed above, however, finding justifiable reliance for amounts exceeding the Debtor's credit limit to be lacking here, the Court holds that $10,500 of the above debt, plus any applicable late fees (excluding over the limit fees), and interest at the contract rate accruing prior to the filing date of the Debtor's

bankruptcy petition, is nondischargeable pursuant to Code § 523(a)(2)(A).

An Order consistent with the foregoing Findings of fact and conclusions of law will be entered concurrently with this Opinion.

---

8. The computer notes reveal the following information about the Debtor's account history from November, 1994 to March, 1995:

| Closing Date: | 11/10/94 | 12/10/94 | 1/10/95 | 2/10/95 | 3/10/95 |
|---|---|---|---|---|---|
| Balance | $4,133.45 | $9,291.74 | $9,660.78 | $10,408.05 | $10,354.33 |
| Min. Payment | $87 | $195 | $203 | $219 | $217 |
| Actual Payment | $5,230 | $80 | $200 | $210 | $9,858.78 |